INTERNATIONAL ADMINISTRATORS,
INC. and Sheldon Harrison,
Plaintiffs-Appellants,

v.

LIFE INSURANCE COMPANY OF
NORTH AMERICA,
Defendant-Appellee.

No. 83–2102.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 14, 1984.

Decided Jan. 24, 1985.

20. Quoted *supra* n. 9.

Katrina Veerhusen, Kevin M. Forde, Ltd., Chicago, Ill., for plaintiffs-appellants.

William J. Holloway, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and GORDON, Senior District Judge.*

CUDAHY, Circuit Judge.

International Administrators, Inc. ("IAI"), appeals from an order of the district court granting summary judgment to the Life Insurance Company of North America ("LINA") in an action brought by

---

* The Honorable Myron L. Gordon, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation.

IAI on several tort claims and a contract claim. 564 F.Supp. 1247. IAI argues that various privileges the district court allowed LINA to invoke are not applicable here, and that the district court incorrectly applied the parol evidence rule to the contract claim. We affirm.

## I.

Beginning in 1976, IAI, an insurance broker, asked LINA, a Pennsylvania corporation, to underwrite various policies for the Iowa American Legion.[1] Premiums on the Iowa Legion policies were sent to IAI; IAI was to forward them to LINA within 45 days after the first day of the billing quarter. Beginning in June, 1980, and until March, 1981, IAI was, on average, 139 days late in remitting premiums on the various policies.

By mid-March of 1981 LINA had decided to bring its dealings with IAI to an end. Since under the terms of the various contracts the Iowa Legion was an IAI account, which LINA would presumably lose when dealings with IAI were terminated, LINA gave notice to officials of the Legion. LINA claims that it was concerned to give notice according to the terms of the policies, and that the policies required notice to be given thirty days before the anniversary date, the only permissible cancellation date. The district court found that, although there was some dispute on the issue, LINA's belief that May 1 was the anniversary date was reasonable and justified; this point is not contested on appeal.

On March 18, 1981, Sheldon Harrison, president of IAI, received an undated letter from LINA, which read:

Your account with [LINA] is considerably overdue. Our records indicate non-payment of premium for the [Iowa Legion] accounts as far back as September of 1980. In addition, much of this business was moved to other carriers without proper notification to us.

We must insist that all past due premiums be remitted to us immediately. If we do not receive a full accounting with the appropriate premiums by March 23, 1981, we shall begin legal action to collect these accounts.

Shortly afterwards, on March 19, LINA sent the letter to the Iowa Legion in which it declared its intention to cancel the insurance policies because of the late payment:

We regret to inform you that we have not received certain premiums on policies issued to the Iowa American Legion that were due as far back as September 1980. These premiums were collected by your broker, Mr. Sheldon Harrison of G & H Insurance Administrators, Inc., but have not been remitted to [LINA].

We must inform you that under these circumstances it is no longer possible for us to do business with Mr. Harrison. Since he is your appointed broker, we are in a position that forces us to terminate our relationship with your organization as long as he is your representative. We regret that this action is necessary and trust you can appreciate our situation. Please accept this letter as intent to cancel Policy # AGL-270 on May 1, 1981. We will, of course, cooperate with you in every way and see that individual claims are handled properly.[2]

Because of the March 19 letter the Iowa Legion, rather than permit its LINA policies to be cancelled, switched its business from IAI to one of three brokers whose names it had solicited from LINA.

---

1. In 1976 IAI was an Illinois corporation with headquarters in Illinois. In February, 1980, it was sold to G & H Administrators of Texas, Inc., a Texas corporation with headquarters in Texas. Since that time IAI has had its headquarters in Texas, although it has remained an Illinois corporation.

2. The terms of the policy required such a notice to be sent to the policy holder:

*Policy Termination by the Policyholder or the Company:* Either the Policyholder or the Company may terminate this policy on the first or any subsequent anniversary of the date of issue by written notice mailed or delivered to the other at least 30 days prior to the effective date of termination.

Accident & Sickness Policy AGL-270. At the head of the policy are the words: "Policy Effective Date: 5-1-76," and "Iowa Department, The American Legion. (Herein called the Policyholder)."

IAI then sued, charging LINA with tortious interference with contractual relations and prospective advantage, with breach of contract and with defamation.[3] The district court granted LINA's summary judgment motion with respect to these counts, and IAI brought this appeal.

## II.

Because Illinois, alone among the states having contacts with this litigation, has a provision in its insurance code arguably immunizing LINA from liability for information conveyed in the letters of nonrenewal, there is a question of applicable law. IAI argues on appeal that Iowa law should apply.

**3.** Other counts were dismissed earlier and are not in issue here.

**4.** Were we to decide the issue of applicable law as an original matter, innocent of the record that is in fact before us, it is unlikely that we would choose Illinois law as the law governing each issue.

In diversity a federal court must look to the law of the forum in which it sits for substantive law, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 71–80, 58 S.Ct. 817, 819–823, 82 L.Ed. 1188 (1938), including the rules governing choice of law. *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). In tort, Illinois—following the Restatement (Second) of Conflicts of Law—applies the law of the state with the most significant relationship to the transaction at issue. *Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593, 595 (1970). In *Mitchell v. United Asbestos Corp.*, 100 Ill.App.3d 485, 55 Ill.Dec. 375, 426 N.E.2d 350, 355 (1981), the Illinois Supreme Court disavowed any mechanical approach to the problem, preferring instead to weigh the "interests and public policies of [each contact state] as they relate to" each transaction in issue. *See also In re Air Crash Disaster Near Chicago, Illinois*, 644 F.2d 594, 610–11 (7th Cir.1981).

The states with contacts to this case are Illinois, the state of incorporation of IAI; Iowa, where the alleged defamation was published; Texas, where IAI was headquartered and where, arguably, the impact of the activity was felt; and Pennsylvania, where LINA is headquartered and where the conduct causing the alleged tort took place. *See* RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 6 (1971).

Conflicts rules are appealed to only when a difference in law will make a difference to the outcome. *In re Air Crash Disaster*, 644 F.2d at 605. The choice of law is not made once for all

Since the result we reach in this opinion is supported as well by the common law doctrine of conditional privilege, and since IAI has conceded that the law of Iowa does not differ from the law of Illinois on conditional privilege, application of Iowa law would not change the outcome. In that sense it is immaterial whether Illinois law or Iowa law is applied.

■ Nevertheless, on the record before us we are obliged to approve the district judge's choice of Illinois law. Neither party objected to that choice in the district court, and thus it is not open to us to reconsider that issue, absent some compelling reason of policy.[4]

It is true that, when the Illinois immunity provision was first raised as a defense, IAI,

issues; the trend is to decide the applicable law for each issue separately. *Id.* at 611; Reese, *Depecage*, 73 COLUMBIA L.REV. 58 (1973). Hence on issues about which there is no disagreement among the contact states, we would apply the law of Illinois, the forum state.

With regard to conditional privilege as a defense to both defamation and the other tort claims, the parties have conceded that the law of Iowa is substantially similar to that of Illinois; the laws of Pennsylvania and Texas are similar as well. *Compare Parker v. Holbrook*, 647 S.W.2d 692, 697 (Tex.App.1982) *and Beckman v. Dunn*, 276 Pa.Super. 527, 419 A.2d 583, 587 (1980) *with Zeinfield v. Hayes Freight Lines, Inc.*, 41 Ill.2d 345, 243 N.E.2d 217, 220–21 (1969). Likewise the parol evidence rule, LINA's defense to the contract claim, is, for our purposes, substantially similar in all four jurisdictions. *See Bachewicz v. American Nat. Bank & Trust Co. of Chicago*, 126 Ill.App.3d 298, 81 Ill.Dec. 294, 466 N.E.2d 1096, 1110 (1984); *Bankers Trust Co. v. Woltz*, 326 N.W.2d 274, 276 (Iowa 1982); *Weinacht v. Phillips Coal Co.*, 673 S.W.2d 677, 679 (Tex.App.1984); *Hamilton Bank v. Rulnick*, 475 A.2d 134, 136 (Pa.Super.1984).

The only point of disagreement concerns the privilege the Illinois statute grants to insurance companies with respect to information conveyed in nonrenewal and cancellation letters. None of the other states has an equivalent provision. 40 PURDON'S PA.STAT.ANN. § 1008.7 (1983), "Liability for giving information," applies to automobile insurance only; and so does IOWA CODE ch. 515D-12 (1983). "Immunity from Liability." Neither state has a similar provision for the kind of insurance in question here. TEXAS INS.CODE Art. 21.49-2 (1983), "Declination, Cancellation, and Nonrenewal of Certain Policies," which purports to cover all insurance policies, insulates insurance companies from liability for

although conceding the applicability of Illinois law, tried to avoid the effect of the provision by pointing out that under Illinois law the intent of the parties to an insurance contract decides what law will govern the interpretation of the contract, and that the parties to these contracts—LINA and the Iowa Legion—intended Iowa law to govern. If this litigation concerned the construction or validity of the insurance policies, and if the parties to this litigation were the same as the parties to the insurance policies, then Illinois courts would, other things being equal, apply the law provided for by the parties. *Hofeld v. Nationwide Life Insurance Co.*, 59 Ill.2d 522, 322 N.E.2d 454, 458 (1975); RESTATEMENT (SECOND) OF CONFLICTS OF LAW §§ 187, 192, 193; 6A CORBIN ON CONTRACTS § 1446 (1962). As Corbin points out, this may not even rise to the status of applying foreign law:

> In applying this tentatively suggested rule, the court would not even appear to be enforcing the 'laws' of another jurisdiction than its own; it is merely enforcing the contract as made by the parties in accordance with its own system of law.... In applying this rule the court of the forum would merely enforce its own law as to the making of contracts, recognizing and giving effect to bargains that parties are empowered by that law to make.

It was thus perfectly consistent for IAI to accept Illinois law as governing and yet appeal to Iowa law as the law of the contract.

The law of the contract is, however, irrelevant to the issues before us. The dispute

information contained in statements of cancellation or nonrenewal, but specifically excludes disclosures that are known to be false or made with an intent to injure. The Illinois code, as we will see, has no such qualifications. The question we must resolve, therefore, is whether to apply the Illinois provision.

Tort privileges and immunities, such as the one at issue here, pose a special difficulty for the determination of governing law. *See* Comment a. to § 163. But here, we are at a loss to see why anyone would suppose that the Illinois statutory privilege applies. Even if the Illinois policy is a strong one, it is hard to see why Illinois policy comes into the picture at all. The injury did not occur in Illinois, no matter how we define injury: publication took place in Iowa, and the firm alleging injury is headquartered in Texas. Although LINA has argued before this court that, in the case of a corporation, the place of incorporation is the place of injury, we find no support for that proposition. The one case cited by LINA, *Int'l Merchandising v. Lighting Systems*, 64 Ill.App.3d 346, 20 Ill.Dec. 838, 380 N.E.2d 1047 (1978), makes another point entirely. "At least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation ..." RESTATEMENT SECOND, Comment e to § 145. Where the injury is loss of customers or trade, the injury occurs at the place of loss (Iowa), but is most keenly felt at the principal place of business. Comment f to § 145. In any case, where the conduct in issue is publication, the place of publication, Iowa here, is under most circumstances the place of injury. *Ginsburg v. Black*, 192 F.2d 823 (7th Cir.1951), *cert. denied*, 343 U.S. 934, 72 S.Ct. 770, 96 L.Ed. 1342 (1952).

None of these roads leads to Illinois. There is a connection with Illinois; IAI is incorporated in Illinois. The connection is a legal and formal one, and seems to us to have little to do with the business activities of the firm. The place of incorporation is frequently a matter of little concern, except as a way of achieving tax and other advantages.

Were we to determine this as an original matter, then, it is not clear that we would apply the Illinois statutory defense to the tort claims raised by a Texas firm against a Pennsylvania firm for letters published in Iowa. Were we to determine that the immunity provided by § 143.18 of the Illinois Insurance Code does not apply to the tort claims in this case, and that in other respects the laws of the four states are substantially similar, we would apply Illinois law, as the law of the forum, without the provision in question.

During most of the proceedings before the district court (proceedings that lasted for about 18 months), Judge Shadur was not asked to rule on this issue, and properly applied Illinois law without qualification. When, after two opinions had been entered, the question was finally raised, it was raised only to make the confused point concerning the "law of the contract" discussed below in the text, and Judge Shadur found that the grounds suggested for applying the Iowa Insurance Code were irrelevant to the issues in this case. Although we are not certain that Illinois law would apply to every issue, were the question properly argued, we are certain that it is not the job of the trial judge to do the parties' work for them. RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 136.

is not over provisions of the contract, and is not between parties to the contract. Although parties may provide for their own future litigation, it is too much to suppose that they may bind others who are not parties or beneficiaries to that decision, and no court that we are aware of has ever so held. For all purposes relevant to the issues before us, IAI acquiesced in the decision of the trial court to apply Illinois law.

Where, with the acquiescence of both parties, the district court has applied Illinois law, it would be manifestly unfair and inappropriate, absent compelling reasons of policy, for this court to disapprove the decision to apply Illinois law. *Bilancia v. General Motors Corp.*, 538 F.2d 621, 623 (4th Cir.1976); *Wachs v. Winter*, 569 F.Supp. 1438, 1443 (E.D.N.Y.1983).[5] We hold, therefore, that under Illinois choice of law rules Illinois substantive law governs in this case.

### III.

IAI's tort claims are based upon the March 19 letter to Iowa Legion officials. IAI claims to have been injured by this letter, and alleges tortious interference with IAI's contractual relationship with the Iowa Legion, and interference with prospective advantage. IAI also claims that this communication defamed Harrison and his corporation, G & H Insurance Administrators, Inc.

The issue whether or not a federal court should grant summary judgment in a diversity action is, of course, a question of federal law. *General Accident, Fire & Life Assurance Corp. v. Akzona, Inc.*, 622 F.2d 90, 93–94 n. 5 (4th Cir.1980); *Cohen v. Ayers*, 596 F.2d 733, 743 n. 20 (7th Cir.1979). Under FED.R.CIV.P. 56, summary judgment is to be granted if the record, including pleadings, depositions and answers to interrogatories, admissions and affidavits, shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." All factual inferences are to be taken against the moving party and in favor of the opposing party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

In granting LINA's summary judgment motion, the district court found that LINA was insulated from liability on the tort claims by Illinois Insurance Code § 143.18, 73 S.H.A. § 755.18, and by the Illinois conditional privilege doctrine.[6]

### A. *Statutory Immunity Under Section 143.18.*

Section 143.18 of the Illinois Insurance Code provides:

> Liability of company or agents regarding statements made in notices or information. There shall be no liability on the part of and no cause of action of any nature shall arise against any company, its authorized representative, its agents, its employees, or any firm, person or corporation furnishing to the company information as to reasons for cancellation, or nonrenewal, for any statement made by any of them in any written notice of cancellation or nonrenewal, or any other communications, oral or written, specifying the reasons for cancellation or nonrenewal, or for the providing of information pertaining thereto.

---

**5.** Compare RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 136, comment h: "In all of these situations, where either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interest of justice." "All of these situations" includes the situation in which neither party refers "to the foreign law either in the pre-trial stages or at the trial."

**6.** We note again in passing that IAI has conceded that whatever the outcome in Illinois under the doctrine of conditional privilege, the outcome would be the same under Iowa law; we note also that the elements of this defense are the same in Texas and Pennsylvania. *See Beckman v. Dunn*, 276 Pa.Super. 527, 419 A.2d 583, 587 (1980); *Parker v. Holbrook*, 647 S.W.2d 692, 697 (Tex.App.1982).

IAI does not argue that the district court left genuine issues of fact unresolved in holding that the Illinois statutory provision blocked its claims. It argues, rather, that the district court erred on the law, and that section 143.18 was not intended to bar these claims; and that if applied to bar these claims the section would be unconstitutional.

### 1. The Applicability of Section 143.18.

IAI contends that since Illinois requires insurance companies to give reasons for cancellation and nonrenewal of policies, 73 S.H.A. §§ 755.15–755.17, the purpose of the Illinois legislature in passing the immunity provision was to protect insurance companies from claims by the *insured,* who might take issue with the reasons for cancellation or nonrenewal. Hence, according to IAI, the provision was intended to bar suits by the insured, but not suits by third parties, including brokers.

The language of the statute is not ambiguous. There shall be *"no* liability on the part of," and *"no* cause of action of *any* nature" shall arise against *"any* company," its agents, representatives, employees or informants, for *"any* statement" made in *"any* written notice of cancellation or nonrenewal" giving reasons for such action. Unless there is a persuasive reason to the contrary, words in statutes should be given their common meanings. *In re Clark,* 738 F.2d 869, 872 (7th Cir.1984); *Ulane v. Eastern Airlines, Inc.,* 742 F.2d 1081, 1085 (7th Cir.1984). Here the words used are plain enough; the statute bars all such suits.

Moreover, a careful reading of the statute shows that its sole purpose cannot be to protect insurance companies, since the statute immunizes not only the companies, but anyone who provides them the information used in letters of cancellation or nonrenewal. The broader purpose seems to be to protect and insure the flow of information, presumably for the ultimate protection of the consumer of insurance: the theory is that the insured who can learn of and dispute misinformation conveyed to his insurance company is better off than one who cannot learn of such misinformation because of the company's fear of a lawsuit. If protection of the flow of this information is what is sought, then it is reasonable to protect this flow against all suits, as the legislature has apparently chosen to do.

IAI raises the North Dakota case of *Emo v. Milbank Mutual Ins. Co.,* 183 N.W.2d 508 (N.Dak.1971), in which the North Dakota Supreme Court, discussing a similar provision in the North Dakota Insurance Code, said, "[i]t is our view that the Legislature intended to protect an insurance company from libel actions brought on behalf of the policy holder and none other." 183 N.W.2d at 515. IAI's appeal to *Emo* is not persuasive. With due respect to the North Dakota court, it seems to us that the purposes underlying the Illinois statute—as we discern them—cannot be served by protecting the delivery of information only against suits by the insured; if it is in the interest of consumers to know why their insurance policies are being terminated, it is certainly in their interest to know when their policies are being terminated, as in the case before us, because of the behavior of a third party. If such information is not protected, then it is less likely to be available; and for that reason, and because we think it would not have been difficult for the Illinois legislature, had it so elected, to limit the statute to prohibit suits only by the insured, it seems to us that the statute must be read as it is written to bar *all* suits.

We conclude, therefore, that neither the language of section 143.18 nor the policy underlying it supports IAI's position that this statutory provision does not apply in this case.

### 2. The Constitutionality of Section 143.18.

IAI also claims that section 143.18 as applied to these facts is unconstitutional. It claims that the provision is special legislation for the benefit of insurance companies; that it denies equal protection to individuals and companies who transact business with insurance companies; and that it

violates Article I, § 12 of the Illinois Constitution, which guarantees a remedy for every wrong.

These claims are without merit. In *Anderson v. Wagner*, 79 Ill.2d 295, 37 Ill.Dec. 558, 402 N.E.2d 560 (1979), the Illinois Supreme Court said that where legislation treats one class of persons differently from another class, "the classifications must be reasonably related to the legislative purpose and it must appear that there is a sound basis for regarding the class as distinct and separate for the purpose of legislation." 402 N.E.2d at 572. Here the class protected consists of insurance companies, together with their agents, representatives and employees and *all those who provide them with information,* and the protection extends only to information or misinformation conveyed in letters of cancellation or nonrenewal. If the purpose of the legislation is to insure the free flow of information in such letters, as we think it is, then the classification chosen is reasonably related to that purpose. It protects all who provide information, and not just insurance companies.

IAI also argues that the legislation works *against* a class of injured parties, those allegedly defamed, in a way that deprives them of the equal protection of the laws. There is no way to erect a defense to defamation without taking a right of action away from those allegedly defamed. If the class of persons protected is reasonable, it is difficult to see how the class of persons the legislation works against could be unreasonable. IAI does not call the purpose behind the statute into question; nor has it argued that any group of persons situated similarly to the protected class is not bound by the statute. *See Vogel v. Robison,* 80 Ill.App.3d 312, 35 Ill.Dec. 622, 399 N.E.2d 688, 689–90 (1980); *Tyrken v. Tyrken,* 63 Ill.App.3d 199, 19 Ill.Dec. 932, 379 N.E.2d 804, 808 (1978).

And finally this same point answers the claim that the legislation violates the Illinois Constitution. Whenever a defense is erected, a class of rights of action is eliminated. To say that the defense leaves a wrong without a remedy would make every defense a violation of the Illinois Constitution. Such a result is wholly unacceptable, and has been rejected by the Illinois courts. *See Tyrken v. Tyrken,* 379 N.E.2d at 807 (holding that the tort immunities created by the Right of Married Women Act do not violate the Illinois Constitution).

The district court was correct, therefore, in its conclusion that Section 143.18 bars IAI's tort claims.

### B. *Conditional Privilege.*[7]

In Illinois, the doctrine of conditional privilege developed first in defamation

---

7. The Restatement Second of Torts recognizes a defense of conditional privilege for defamation:

§ 593. Elements of Conditional Privilege Arising from Occasion.

One who publishes defamatory matter concerning another is not liable for the publication if

(a) the matter is published upon an occasion that makes it conditionally privileged and

(b) the privilege is not abused.

§ 595. Protection of Interest of Recipient or a Third Person

(1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

(a) there is information that affects a sufficiently important interest of the recipient or a third person, and

(b) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the generally accepted standard of decent conduct.

(2) In determining whether a publication is within generally accepted standards of decent conduct it is an important factor that

(a) the publication is made in response to a request rather than volunteered by the publisher or

(b) a family or other relationship exists between the parties.

Ways in which the privilege can be abused are listed in § 600: "Knowledge of Falsity or Reckless Disregard as to Truth;" § 603, which states that one who invokes the privilege must act for the purpose of protecting the interest for the protection of which the privilege is given; § 604: "Excessive Publication;" and § 605, which says that the publisher must reasonably believe publication to be necessary.

Another Restatement section recognizes a defense of conditional privilege for interference torts.

cases. In *Zeinfield v. Hayes Freight Lines, Inc.*, 41 Ill.2d 345, 243 N.E.2d 217, 221 (1969), the Illinois Supreme Court set out the elements of the defense: the defendant must in good faith believe that he has a duty to make a certain communication, and he must in good faith believe the communication to be true. In time this defense has come to apply to the torts of interference with contractual relations, *see Gasbarro v. Lever Brothers Co.*, 490 F.2d 424, 426–27 (7th Cir.1973), and interference with prospective advantage, *American Pet Motels, Inc. v. Chicago Veterinary Medical Ass'n*, 106 Ill.App.3d 626, 62 Ill.Dec. 325, 435 N.E.2d 1297, 1303 (1982). Thus if LINA's actions are entitled to conditional immunity, and if those actions do not exceed the scope of the immunity, then LINA has a complete defense against IAI's tort claims.

The district court found that the record showed conclusively that LINA had, and reasonably believed it had, a duty to make the challenged communications; that LINA believed, and was justified in believing, the communications to be true; and, most relevantly, that IAI had not raised any genuine issues of material fact as to these points. IAI challenges this basis for the grant of summary judgment by arguing that there are factual questions about LINA's good faith which remain to be resolved.

■ After careful consideration of IAI's contentions, we conclude that summary judgment was justified on the basis of conditional privilege. We find, as the district court did, that LINA has satisfied the privilege requirements in that it sent the letters to protect its legitimate interest in ensuring timely receipt of premiums, and to fulfill its duty under the insurance contract to send notice not to renew. We also find no reason to doubt that the disclosures made in the letters are substantially true, and no reason to doubt that LINA believed them to be true.

■ In its attempt to create issues of fact, IAI argues that the fact that payments had been consistently late for over a year had the effect of modifying the 45-day requirement in the original contract. The point, though not persuasively argued, is evidently that acceptance of consistently late payments estopped LINA from claiming that payments were overdue. While it is true that under some circumstances a pattern of late payments will defeat a contract provision, *Yorke v. Gane Brothers & Lane, Inc.*, 298 F.2d 412, 414 (7th Cir.1962), and preclude one of the parties from insisting on timely payments, nothing in the law prevents nonrenewal of a contract on the ground that payments have been consistently late. Moreover, the district court found, as a matter of uncontroverted fact, that IAI had been asked repeatedly, though not in writing, to correct its late payments.[8] These repeated requests, ending in termination of dealings with IAI, argue against the conclusion that LINA acquiesced in the late payments. *Yorke v. Gane Brothers*, 298 F.2d at 414; *Neil v. Kennedy*, 319 Ill. 75, 149 N.E. 775, 777 (1925).

As evidence of LINA's "bad faith," IAI points out that, as of the time of the March 19 letter, it was "more current than usual" in its payments. IAI argues that LINA timed its letters so that the Iowa Legion would have no choice but to change brokers. IAI also questions the amount by which the various policies were said to be overdue. It is apparent to us, as it was to the district court, that none of the issues that IAI has raised are of real significance to the question of conditional privilege.

§ 773. Asserting Bona Fide Claim
One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

8. On appeal IAI argues only that the March letter was the first *written* request. Assuming, as we must, that the contention is true, it does not contradict LINA's claim to have made requests by phone.

IAI's allegations concerning LINA's motive are not only conclusory and unsupported by any of the showings IAI has made, they are also largely irrelevant. An insurance company with a duty to itself and its insured to terminate a relationship and, in the process, to make known information it reasonably believes to be true, may very well hope that the disclosure will lead the insured to take action. Indeed, the purpose of both the Illinois statutory immunity and the doctrine of conditional privilege is to insure the flow of information upon which such action can be based. Beyond examining LINA's belief in the truth of the information disclosed, and in its duty to disclose it, therefore, we will not undertake to look into the workings of LINA's corporate mind. *Hanpt v. International Harvester Co.*, 582 F.Supp. 545, 550 (N.D. Ill.1984); *Bentley v. Teton*, 19 Ill.App.2d 284, 153 N.E.2d 495, 498 (1958); W. PROSSER, LAW OF TORTS 943 & n. 94 (4th ed. 1971).

LINA notified the Iowa Legion of its intention not to renew policies because of its decision not to do business with IAI. It explained that IAI had collected premiums but had not paid them to LINA, and that on some policies premiums due "as far back as September, 1980" were unpaid. LINA made no mention, in this letter, of the total amount by which IAI was in arrears, so that IAI's extended arguments concerning the amount are largely irrelevant. It appears that the premiums that were longest overdue went back only to October and not to September.[9] We feel, as the district court did, that this is not a significant error, and that the communication was in all respects substantially true. *See Kilbane v. Sabonjian*, 38 Ill.App.3d 172, 347 N.E.2d 757, 761 (1976). No reason has been suggested for thinking that the communication, which was substantially true, was not *believed* by LINA to be substantially true.

The district court also found that LINA in good faith believed that it had an interest in keeping premium payments up to date, and a duty under the contract to notify the policy holder of the intent to terminate. IAI now argues that industry practice dictates that even if LINA was justified in communicating with the policyholder, its communications should have been made through the broker, and that the fact that LINA did not go through IAI is further evidence of its bad faith. According to IAI, custom and practice required LINA to inform IAI, and IAI would then inform the policyholder of the intention to cancel.

Policy AGL–270, the Iowa Accident & Sickness Policy, contains the following provision:

> *Policy Termination by the Policyholder or the Company.* Either the Policyholder or the Company may terminate this policy on the first or any subsequent anniversary of the date of issue by written notice mailed or delivered to the other at least 30 days prior to the effective date of termination.

Had LINA followed any procedure other than the one prescribed, termination would presumably have been ineffective. LINA was justified in believing, therefore, that it was obliged to communicate its intention not to renew directly to the policyholder.

Moreover, it seems a reasonable business practice, in the interest of LINA, to try not to appear to be cancelling arbitrarily. The reason for not renewing was that premiums had not been kept up to date, but this problem involved no fault of the policyholder. It seems not unreasonable to inform the policyholder of that fact.

The defense of conditional privilege protects communications made in the reasonable belief that they are true, and in the reasonable belief that they are required by some interest or duty. A letter from an insurance company giving reasons for not

---

**9.** The evidence shows that payment for the September premiums was received only three days before the March 19 letter went out.

renewing a policy would seem, other things being equal, to meet these criteria.

Nor did the letters here exceed the bounds of the privilege. IAI complains that the language of the letters was "overly broad," citing *Welch v. Chicago Tribune*, 34 Ill.App.3d 1046, 340 N.E.2d 539, 543 (1976). While it is true, as IAI suggests, that LINA might have said simply that IAI's performance was "unsatisfactory" we think such an explanation would itself have been unsatisfactory and inadequate from the point of view of good business practice. LINA has said no more than it was necessary to say. In spite of IAI's efforts to suggest various unseemly things that might be read into the letter, the letter itself says no more than that IAI has not been promptly forwarding premiums, and that for that reason the policies are to be terminated. The Iowa Legion had a right to that information and, on receiving it, not inappropriately withdrew its business from IAI. Finding no genuine issue of material fact, we conclude, therefore, that the district court was right to grant summary judgment in favor of LINA on the issue of conditional privilege.

## IV.

IAI also claims that LINA breached a commission agreement reached in November, 1978. This agreement, LINA argues, is embodied in a letter of November 22, as modified by a letter of November 27. LINA, on the other hand, argues that an agreement of January 9, 1979, signed by both parties, covers the same issues and is therefore, on the question of the commission agreement, the last word between the parties.

The district court found the November 22, 1978 letter [10] from LINA to be a unilateral offer and not an agreement, and found it to be part of ongoing negotiations which culminated in the contract of January 9, 1979.[11] Since the later contract was an

---

**10.** The November 22 letter reads as follows:

The following is a synopsis of our continuing discussion on these risks:

1) we will provide coverage exactly as written now, except that the cancer plans *may* need a rate increase in one year. At some future date we would also like to place a $250,000 limit on the wheels program;

2) we will pay 40% first year on the cancer business, 40% on wheels and 20% renewal on both;

3) we will provide 3% expense reimbursement on the cancer business for one year and a 5% allowance on the wheels business;

4) we will allow a $.50 semi-annual billing fee for your use (we will file semi-annual rates of $12.00 on the wheels, $21.00 and $30.00 on the Iowa Cancer plan and $18.00 and $27.00 on Illinois Cancer);

5) we will *type* and *mail* all certificates during the takeover period and pay for all brochures, letters, and envelopes during solicitations;

6) we will allow an agency contingency on Iowa and Illinois Legion Wheels policies whereby we will take 20% for our expenses, profit, etc., allow your 25% commission takeover first year (30% new and 20% renewal thereafter), subtract the paid claims and IBNR (15% premium at year end) and split the remainder 50/50 until you reach 10% total additional compensation. Here is an example:

|  | 1st Year—$100,000 Premium— | 2nd Year |
|---|---|---|
| Co. Expenses | $20,000 | $20,000 |
| Agency Comm. | $25,000 | $20,000 |
| Paid claims | $20,000 | $40,000 |
| IBNR | $15,000 | none |
|  | $80,000 | $80,000 |

Split 50% of $20,000 = $10,000   Split 50% of $20,000 = $10,000

7) your duties will entail billing and collecting, paying postage and stuffing during solicitations and issuing after the initial takeover. The first year, assuming no new business and no loss of insureds, would give you a commission and service fee level of slightly over 25% on the cancer business without a rate increase for at least one year. On the wheels business, your first year commission and service fee would give you a 29% level. From then on the cancer business would allow you in excess of 22% and the wheels, with a 10% contingency, 34%.

I feel any increase in takeover allowance will unjustly affect the Illinois Cancer program as to insure a rate increase. If it has a paid loss ratio of 53% and an IBNR of 15%, with a commission level of 20% plus 5% takeover allowance, only 7% is left for the company. Doing it my way with the service fee allowance of $1.00 and 3% service fee gives you the same amount of money and allows us an additional 2% to work with.

Thanks for your interest.

**11.** The January 9 agreement reads as follows:

integrated document embracing the subject matter of the original, the district court held that consideration of the earlier letter was barred by the parol evidence rule, and that the earlier offer was implicitly revoked by the making of the offer that culminated in the contract. Summary judgment was granted on this issue as well.

The January 9, 1979 agreement, signed by both parties, sets out "the commission" payable on a number of policies, including those mentioned in the November 22 letter. In Illinois, the parol evidence rule excludes evidence which would change the meaning of a written document, if the evidence concerns dealings prior to the writing. *Bachewicz v. American Nat. Bank & Trust Co.*, 126 Ill.App.3d 298, 81 Ill.Dec. 294, 466 N.E.2d 1096, 1110 (1984). Where a written agreement shows a complete legal obligation, without uncertainty as to the object and extent of the obligation, evidence of an earlier agreement cannot be introduced to add another term to the agreement, even though the earlier agreement may contain writing on the particular term to which the evidence is directed. *Ginsburg v. Warczak*, 330 Ill. App. 89, 69 N.E.2d 733, 736 (1946). It is clear that the January 9, 1979 agreement covers commissions on all of the policies mentioned in the November 22 letter; there is no reason to suppose that only part of the commission is the subject of the agreement. Since the later agreement purports to cover all the commission arrangements, it is not really necessary to consider whether the earlier letter was in fact an agreement. IAI's offer of evidence that the drafter of the November 22 letter from LINA intended it to be the final agreement (evidence which, as we will see, is less than convincing in light of the wording of the document) is therefore irrelevant.

We note, however, that the earlier letter does not purport to be an agreement. The November 22 letter begins: "The following is a synopsis of our continuing discussion on these risks [policies]." The last paragraph but one discusses the merits of various ways of apportioning certain allowances. It would be difficult to support the conclusion that this letter constituted a final agreement rather than a step in an ongoing series of negotiations. The same is true of a letter of November 27, 1978, which IAI introduced on appeal, though not at trial.[12] This second letter amends sever-

---

In consideration of an advance commission payment of $50,000, it is hereby understood and agreed that the commission schedule payable for the following Associations and the applicable coverages shall be:
  40% of premium for one year for new business;
  20% of premium thereafter. (renewal)
                On:
  CBers—Wheels
  Iowa Department-American Legion—Cancer and Wheels
  U.S. Veterans-Cancer
  National Police & Fire Fighters—Cancer
  Medical Specialties Insurance Trust—Cancer
  Salesman's Opportunity—Wheels
  International Rescue & First Aid—Wheels
  International Taxicab—Wheels
  Illinois Department-American Legion—Cancer and Wheels
In addition to the renewal commission schedule, an additional 5% commission will be payable for one year on all takeover business commencing February 1, 1979. The additional 5% commission shall be used to reduce the $50,000 advance commission. An interest rate of 1% per month shall be charged on the unpaid balance and will be debited to the unpaid balance. The interest will be charged beginning February 1, 1979. The Agency may elect to pay the balance at anytime or accelerate the payment of the advance commission. The Company will remit to the Agency a monthly accounting of the balance in the account.
It is signed by both parties.

12. The November 27 letter reads as follows:
  As per our discussion on Wednesday, November 22, we agree to pay a 5% one year transfer expense allowance on all cancer business in force with Illinois and Iowa American Legions. Also, in amending my letter of November 22, point number 2, we will pay 40% first year commissions on first year wheels business.
  Additionally, all persons who presently have cancer coverage in both states will not be subject to the pre-existing condition clause nor will any person incurring liability after the takeover date be refused payment under our plan. Claims incurred prior to the takeover date would be the liability of the prior carrier.

al parts of the November 22 letter, and the second letter's existence makes clearer the fact that negotiations were ongoing. We conclude that the January 9, 1979 agreement was intended to be an integrated agreement covering the subject matter, though not including all the terms, of the November 22, 1978 letter, and that this intention is evident from the document itself.

## V.

For these reasons, we affirm the district court's grant of summary judgment.

It is signed by a LINA manager.