**Jerome ABELES, et al., Plaintiffs,**

v.

**OPPENHEIMER & CO., INC., et al., Defendants.**

**No. 83 C 1468.**

United States District Court, N.D. Illinois, E.D.

March 5, 1986.

---

Robert B. Harris, David C. Roston, Altheimer & Gray, Chicago, Ill., for plaintiffs; Perry Goldberg, Specks & Goldberg, Ltd., Chicago, Ill., of counsel.

James E. Beckley, J. David Montague, Richard S. Schultz, James E. Beckley & Associates, Gary A. Sultz, Stephanie Kanwit, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

This securities action involves transactions in forward contracts for the purchase and sale of Government National Mortgage Association certificates ("GNMA forwards"). Plaintiffs, Jerome and Betty Abeles (the "Abeleses"), and members of a class they seek to represent, contracted with the defendants, Oppenheimer & Co., Inc., and Oppenheimer Government Securities, Inc. (collectively "Oppenheimer"), to purchase GNMA forwards. Plaintiffs claim that, as part of these transactions, the defendants extended them credit, but failed to disclose the credit terms as required by Rule 10(b)(16) of the Securities and Exchange Commission (the "SEC").[1]

At the threshold, plaintiffs must first establish that there was an extension of credit, rendering Rule 10(b)(16) applicable.

This issue was presented to the court twice before. Initially, the defendants raised it in their motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(6). In its Memorandum Opinion and Order of November 7, 1983, the court denied that motion holding, in pertinent part, that the complaint sufficiently pleaded facts which, if proved, amounted to an extension of credit. Subsequently, the defendants moved for summary judgment, again arguing there was no extension of credit. The court concluded the record was not sufficiently developed to permit decision of this issue and therefore denied the motion. *See* Court's Memorandum Opinion and Order of December 12, 1984.

Since that time the parties have engaged in extensive discovery. On October 17, 1985, the court directed them to submit all discovery relevant to the extension of credit issue. The parties have done so and have also submitted briefs in support of their respective positions. While not captioned as such, these submissions amount to cross motions for summary judgment. The court will consider them as such.[2]

### I. *Discussion*

#### A. *GNMA Forwards*

A complete understanding of the transactions at issue requires a brief explanation of GNMAs and GNMA forwards. A GNMA certificate represents an interest in a pool of government-underwritten residential mortgages. The GNMA, an agency of the federal government, guarantees timely payment of the mortgage principal and interest. GNMAs have fairly standardized terms and therefore may be pooled and marketed for investment.[3] The

---

1. Rule 10(b)(16), 17 C.F.R. § 240.10b–16, provides in pertinent part:

   (a) It shall be unlawful for any broker or dealer to extend credit, directly or indirectly, to any customer in connection with any securities transaction unless such broker or dealer has established procedures to assure that each customer

   (1) is given or sent at the time of opening the account, a written statement ... disclosing ... (vii) ... the conditions under which additional collateral can be required ...

2. The court may not grant summary judgment unless, looking only to the parties' submissions of admissible evidence, it finds no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See International Administrators, Inc. v. Life Insurance Co. of North America,* 753 F.2d 1373, 1378 (7th Cir.1985).

3. This program is designed to increase the liquidity of such mortgages and thereby attract new private sources of mortgage financing for residential loans. *Abrams v. Oppenheimer*

issuers are usually mortgage bankers who earn their compensation by organizing pools of GNMAs.

GNMAs pay a fixed rate of interest. Their profitability is directly related to the market interest rate for similar term investments. Because it normally takes months to organize a pool of GNMAs, the issuers are subject to the risk that the market interest rate might rise and lessen the value of the pool before it is organized for sale. To avoid this risk, issuers sell "forward contracts;" they contract to deliver GNMA certificates on a future date (the "settlement date"), with an interest rate fixed on the date of the contract (the "trade date"). Typically, the issuer sells to a dealer or broker like Oppenheimer, who in turn, sells to individual investors.

The investor contracts on the trade date to take delivery of a fixed amount of GNMAs at a designated time in the future. He gambles that the interest rate on such investments will decline so that on the settlement date, the GNMAs are earning at a rate above that which is then current. If this happens, he can sell his GNMAs at a profit.[4]

The investor may also liquidate his investment before the settlement date. Among other things, he may sell his right to take delivery and pay for the GNMAs on the settlement date (the "delivery right"). In this circumstance, he will never pay for the GNMA, but will reap the difference between the price he paid for the delivery right and the price such a right carries at the time he closes out his position.

Thus, when the investor purchases a GNMA forward contract he buys both the delivery right and the right to sell or trade the delivery right before the settlement date.

There are obvious risks involved in such an investment. There is a risk that the market price of GNMAs will decline, forcing the investor to take delivery of GNMAs at a below market rate. There is also a risk, borne by both investor and broker, that the other party will not perform on the settlement date. This risk, of course, is tied to the risk of market fluctuation, and the concomitant profitability of the investment.

To insure against the risk of non-performance, the broker requires that the buyer deposit a sum of money to be forfeited in the event of non-performance.[5] The amount of the deposit varies depending on the profitability of the investment during the interim period between the trade and settlement dates. For example, if the value of GNMAs declines by five percent after the trade date, the deposit must be increased by five percent to offset the loss. The deposit insures that the broker will not bear the loss if the investor fails to perform, because, in that event, the broker can take delivery from the issuer and sell the GNMA on the open market. The income from that sale combined with the deposit will make the broker whole. The issue in the instant case is whether the deposit made by the investors, the Abeleses, constitutes an extension of credit such that the broker, Oppenheimer, was required to satisfy the requirements of Rule 10(b)(16).

### B. *The Transactions At Issue*

With this background established, the court turns to the particular transactions at

---

*Government Securities, Inc.*, 737 F.2d 582, 583–584 (7th Cir.1984).

**4.** Often times, the investor simply sells the GNMA to his broker on the settlement date, reaping a profit on the favorable interest rate. In general, as a practical matter, investors in GNMA forwards have little interest in actually holding GNMAs to maturity. Rather, they hope to profit from a shift in interest rates between the trade and settlement dates.

**5.** With regard to delayed delivery GNMA contracts sold on organized exchanges, the individual exchanges regulate the investor/broker de-

posit requirements. The GNMAs at issue here were not traded on any exchange and therefore, the deposit requirement was subject to individual negotiation.

Similar deposits are required of the issuer and broker. 21 C.F.R. § 390.52 requires that the issuer and broker deposit collateral with a third party. Further, each week the issuer and the broker must ascertain the current difference between the contract price and the market price for GNMAs and adjust the deposit to account for any unrealized loss.

issue. While the parties differ as to their characterization of the relevant transactions, the basic facts are not in dispute. On January 19, 1981, the trade date, plaintiffs executed a "Confirmation and Agreement" (the "Agreement"), to purchase GNMA forwards · in the amount of $100,-000. *See* Exhibits A and B appended to Plaintiffs' Complaint. Oppenheimer promised to deliver GNMAs in that amount. The parties agreed to perform these promises on March 19, 1981.

As part of the Agreement, plaintiffs were obliged to and did make a "good faith deposit" equal to ten percent of the GNMAs' face value ($10,000). The Agreement expressly reserved to Oppenheimer the right to alter the deposit amount to insure against plaintiffs' non-performance.[6] The defendants were obliged, however, to pay interest on the deposit.

Apparently, after the trade date, the market price for GNMAs declined. Oppenheimer called upon the plaintiffs to increase the good faith deposit. When the required increase was not forthcoming, Oppenheimer closed out the plaintiffs' position at a loss.

### C. *Extension of Credit*

Whether the deposit constitutes an extension of credit depends upon whether there was a debt due and owing on the trade date. Plaintiffs contend they purchased the GNMAs and incurred a debt to pay the purchase price on the trade date. Oppenheimer argues there was no debt at that time because plaintiffs had no obligation to pay until the settlement date. Oppenheimer characterizes the deposit as

security for performance of an obligation due *in futuro*.

The parties have cited, and the court has found, no case directly deciding this question. Plaintiffs place great emphasis on the Seventh Circuit's decision in *Abrams v. Oppenheimer Government Securities, Inc.*, 737 F.2d 582 (7th Cir.1984). *Abrams* holds that a GNMA forward contract constitutes a purchase and sale of a security and is therefore regulated by the anti-fraud provisions of the securities laws, particularly Section 10(b) of the Securities Exchange Act of 1934. *Abrams*, however, does not answer the question posed here. The essential determination to be made here is not whether a purchase and sale occurred, but when a debt arose. That is, the mere fact of a purchase and sale is not dispositive. It is the terms of that purchase and sale that are in issue.

Plaintiffs further rely on statements by and records of Oppenheimer treating the deposit as a "margin," which indisputably involves an extension of credit. *See e.g.* Plaintiff's Memorandum Concerning Discovery to Date on the Extension of Credit Issue at 2–7 and Exhibits cited therein. In securities parlance, margin is the minimum amount that a securities purchaser must deliver to his broker before title to the securities is passed to him. "The securities margin ... has two significant features: (1) the buyer [is] conveyed title to the securities immediately despite an unpaid balance; and (2) the broker ... extend[s] credit to the new owner for the remainder of the purchase price." Johnson, *Commodities Regulation*, § 1.10.

Margin is an oft misused term. Indeed, it is often misused in transactions like those at issue here.[7] Furthermore, it is the

---

**6.** The Agreement states:

> If, at any time prior to the settlement date, reasonable grounds for [Oppenheimer's] insecurity shall arise with respect to performance by [the Abeleses], [Oppenheimer] may demand adequate assurance of due performance by [the Abeleses] within a reasonable time ... and [the Abeleses'] failure to provide such assurance of due performance within such time shall constitute a repudiation of this Agreement by [them].

*See* Exhibits A and B to Plaintiffs' Complaint.

**7.** Philip Johnson, former Chairman of the Commodity Futures Trading Commission, in discussing commodity futures contracts, which are similar to GNMA forwards with respect to the deposit requirement, points out that "margin" has "unfortunately" been applied by the securities industry to signify a "drastically different economic event:" trading in executory contracts. The term margin is not applicable, says Johnson, to executory contracts. "[U]nlike a securities margin, the deposit made ·... to secure [the issuer and broker's] respective obligations under the futures contract entails *no*

financial reality of the transaction, not Oppenheimer's characterization of it, that is determinative. In this regard, Oppenheimer has the better argument.

The GNMA forward contract actually involves two agreements—one performed during the interim period and the other performed on the settlement date. First, during the interim period, plaintiffs were obliged to maintain a good faith deposit. This froze the risk as between them and Oppenheimer. The deposit also secured the plaintiffs' right to dispose of the delivery right before the settlement date. The deposit was payment in full for this interim right.

On the settlement date, Oppenheimer was obliged to deliver GNMA certificates and the plaintiffs were obliged to pay the full purchase price. There was no debt due and owing until that time. On the trade date, Oppenheimer had not purchased the GNMA certificates, and thus, had advanced no funds on the plaintiffs' behalf. Indeed, the pool from which Oppenheimer would draw the certificates was probably not yet in existence on the trade date.

Had Oppenheimer delivered the certificates without demanding full payment, it would then have extended credit to the plaintiffs. This would have been a classic margin transaction. However, such is not the case. The only issue here is the nature of the parties' relationship between the trade and settlement dates. During that interim period, the plaintiffs had no obligation to pay Oppenheimer the purchase price.

This transaction simply cannot be fitted into the mold of a credit extension. It is hard to imagine an extension of credit where, as here, the "creditor" paid interest to its "debtor." The deposit is more akin to a performance bond or earnest money deposit, designed to insure performance of an obligation at a future date.

In short, there was no extension of credit and thus, no violation of Rule 10(b)(16) because there was no debt obligation to pay the purchase price due and owing on the trade date.[8] The defendants are thus entitled to summary judgment.[9]

## II.  Conclusion

For the foregoing reasons, the court grants defendants' motion for summary judgment and dismisses plaintiffs' complaint.

---

*extension of credit* whatsoever by either party ... It is separate and distinct from the purchase price of the commodity, which is not yet owed to the seller." Johnson, *Commodities Regulation,* § 1.10 at 31 (emphasis supplied). Johnson's analysis is applicable here.

The court finds the analogy to commodities futures closer and more instructive than that, suggested by plaintiffs, to non-convertible bonds.

**8.** Contrary to the plaintiffs' assertions, this ruling is supported by the policy underlying Rule 10(b)(16). In Securities and Exchange Commission Release No. 34-8773, 34 F.R. 19717 (December 16, 1969), which announced the adoption of Rule 10(b)(16), the SEC explained that the rule requires "broker-dealers who extend credit to customers to *finance* securities transactions to furnish specified information with respect to the amount of and reasons for the credit charges." (emphasis supplied). The de-

posit here was not part of a financing arrangement, and there were no credit charges. The deposit was returnable in full with interest upon settlement of the transaction.

The court's result is also in accord with the parallel provisions of the federal Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.,* after which Rule 10(b)(16) is patterned. *Liang v. Dean Witter & Co.,* 540 F.2d 1107, 1111 (D.C.Cir. 1976). The TILA defines "credit" as "... the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(e). Because there was no debt due on the trade date, there was no deferral of a debt payment and thus, no extension of credit under the TILA.

**9.** The court is satisfied that this decision is fully consistent with its prior opinions. Though, should it be construed as conflicting with a prior opinion, this decision is controlling.