**AMERICAN HOME ASSURANCE COMPANY, Plaintiff,**

v.

**DYKEMA, GOSSETT, SPENCER, GOODNOW & TRIGG, a partnership, and Northbrook Excess and Surplus Insurance Company, Defendants.**

**DYKEMA, GOSSETT, SPENCER, GOODNOW & TRIGG and Northbrook Excess and Surplus Insurance Co., Counterplaintiffs,**

v.

**AMERICAN HOME ASSURANCE COMPANY, Counterdefendant.**

**No. 82 C 5418.**

United States District Court,
N.D. Illinois, E.D.

Aug. 20, 1985.

Supplemental Opinion and Judgment Order Nov. 27, 1985.

---

Gerard B. Gallagher, Michael J. Pavlisin, Oak Brook, Ill., John F. Horvath; David F. Pardys, Conklin & Adler, Chicago, Ill., for plaintiff.

Arthur L. Klein, Timothy J. Nalepka, Eugene J. Kelley, Jr., Paige Comstock Cunningham, Miryam R. Rees, Richard L. Rosen, Arnstein, Gluck, Lehr, Barron & Milligan, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

American Home Assurance Company ("American Home") brought this action for declaratory judgment in order to have the Court determine (1) to what extent Dykema, Gossett, Spencer, Goodnow & Trigg ("Dykema"), a Michigan law firm once insured by American Home, is entitled to insurance coverage for certain claims made against it; and (2) to what extent should payments made on behalf of Dykema to settle those claims be apportioned between American Home and Northbrook

Excess and Surplus Insurance Company ("Northbrook"), another insurer of Dykema. Dykema and Northbrook counterclaimed, seeking, *inter alia,* a declaration that American Home was obligated to pay the full amount necessary to satisfy the claims. Before the Court are the parties' cross-motions for summary judgment. Summary judgment is appropriate, of course, only if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). For the reasons stated below, American Home's motion for summary judgment is denied. Summary judgment for Dykema and Northbrook is granted in part and denied in part.

## I. *Undisputed Facts* [1]

### A. *The Barker lawsuit.*

On March 27, 1977, the Michigan Baptist Convention (the "Convention") retained Dykema as counsel. More than two years later in May of 1979, the Convention was sued in this Court by a class of purchasers of note certificates sold and offered for sale by an organization known as the Michigan Baptist Foundation (the "Foundation"). This case was entitled *Barker, et al. v. Farrell, et al.,* No. 79 C 2047 (the "*Barker* lawsuit"). Six months later in November of 1979, Dykema itself was served as a party defendant in the *Barker* lawsuit. The first amended class action complaint alleged that since 1977 Dykema had represented the Convention and another entity, American Baptist Churches of Michigan. Dykema's representation, the complaint alleged, included "certain activities with respect to the affairs of the Foundation including matters pertaining to its offer and sale of Note Certificates." (first amended class action complaint, ¶ 23). The complaint charged Dykema, among many others, with violation of the federal securities law, common law fraud and violation of Florida securities laws. Finally, the first amended complaint specified generally that each count arose from "defendants' unlawful acts in connection with the sale ... of more than $3 million in unsecured note certificates issued by the [Foundation] during the years 1976, 1977 and 1978." (first amended class action complaint, ¶ 1.)

There were two subsequent amendments to the *Barker* complaint. The third (and last) amended complaint, by then captioned *Barker, et al. v. Lee County Bank, et al.,* was filed in April of 1980. This document was a highly detailed document charging the defendants with unlawful acts in connection with the public sale of more than $7 million in mortgage bonds and notes issued by the Foundation during the period of 1974–1978. Dykema's participation in the bond and note offerings was specified in

---

1. In support of their motion, Dykema and Northbrook submitted a detailed Statement of Material Facts and the supporting affidavit of Gregory M. Kopacz, a member of the Dykema firm. Rule 56(e) Fed.R.Civ.P. required American Home to file a responsive affidavit or other evidence establishing specific facts showing that there is a genuine issue for trial. General Rule 12(f) of this Court also required plaintiff to file, in addition to the materials required by Rule 56(e), a concise "statement of genuine issues" setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated. Plaintiff has not done so. Confronted with its failure to comply with both the Federal Rules of Civil Procedure and Local Rule 12(f), plaintiff argued only that it should not be deemed to have admitted the facts as stated (and supported) by defendants since "the alleged factual statements contained in Defendants' motion are replete with conclusion and

characterizations with respect to the circumstances surrounding this matter." Plaintiff's Surreply to Defendants' Motion for Summary Judgment. The Court disagrees. For purposes of defendants' motion for summary judgment, therefore, the Court will accept the facts established by the Kopacz affidavit as uncontroverted.

Similarly, plaintiff belatedly filed a statement of material facts in support of its motion for summary judgment. Pursuant to General Rule 12(f), defendants submitted a statement to "correct" certain assertions made in plaintiff's statement of facts. These "corrections" are supported by the Kopacz affidavit, ¶¶ 3, 6, 17, 23, 35, 42 and Exhibit T. Plaintiff has not submitted any evidence to controvert the affidavit. For purposes of plaintiff's motion also, therefore, the Court must accept the facts established by the Kopacz affidavit as uncontroverted.

paragraphs 66 through 82 of the third amended complaint. That document charged Dykema with knowing participation in conduct which resulted in the unlawful sale of securities. Dykema was also alleged to have prevented material facts from becoming known by the purchasers of the securities. Specifically, paragraph 67 alleged that shortly after being retained by the Convention in March of 1977, Dykema became aware of the grave financial condition of the Foundation and the fact that, among other things, the Foundation had not made legally-required disclosures in connection with the sale of certain note certificates, mortgage bonds and life lease contracts. Subsequent paragraphs alleged actions taken by Ronald Rose, a partner at Dykema, in April, May, June, July and early August of 1977. Finally, in paragraph 82, the third amended complaint alleged that "[e]ven as late as the spring of 1978, when the Foundation's future was hopeless, attorney Ronald Rose urged and advised that the sale of the Note Certificates be continued."

The third amended complaint set forth eight causes of action, five of which were directed at Dykema. Count I alleged that Dykema aided and abetted violations of § 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder; Count II alleged that Dykema's conduct constituted common law fraud and deceit; Count III alleged that Dykema was guilty of reckless or negligent misrepresentation; Count IV alleged that Dykema was guilty of professional or fiduciary recklessness or negligence; and Count VI alleged that Dykema violated Florida securities laws.

### B. *The Insurance Companies.*

On August 19, 1976, American Home issued a professional liability insurance policy to Dykema. The policy was countersigned in Michigan by American Home's agent. The relevant portions of American Home's policy are discussed at length below. Originally, the American Home policy provided professional liability insurance up to a limit of $1,000,000. An endorsement

dated January 12, 1977 raised the policy limit to $2,000,000. Dykema was responsible for a $100,000 deductible applicable to the policy. American Home's policy expired on August 19, 1977.

Two years later on August 19, 1979, Northbrook issued a professional liability insurance policy to Dykema. The specific provisions of Northbrook's policy at issue in this lawsuit are also discussed below.

When Dykema was served with the *Barker* first amended class action complaint in November of 1979, it immediately notified American Home and Northbrook. It is unclear from the record what action, if any, Northbrook took in response to Dykema's notice. By letter dated December 6, 1979 American Home, however, acknowledged Dykema's notice. American Home informed Dykema that it had assigned the law firm of Hinshaw, Culbertson, Moelmann, Hoban & Fuller to represent Dykema in the *Barker* lawsuit and to fully protect Dykema's interest. Six days later, American Home reassigned the case to Karon, Morrison & Savikas, Ltd. ("Karon"). The last paragraph of the December 6, 1979 letter provided as follows:

> If through discovery and/or other procedures it becomes apparent that there are claims made against your firm which are not covered by your policies of insurance the American Home Assurance Company reserves its rights to set forth at a future time those claims and/or judgment rendered against you which are not covered by your insurance policy.

As a result of American Home's assumption of Dykema's defense of the *Barker* lawsuit, Dykema did not retain separate legal counsel. Dykema satisfied the $100,000 deductible obligation and otherwise fully complied with all provisions of the American Home policy.

### C. *Settlement Opportunities.*

Sometime prior to June 24, 1980, the *Barker* plaintiff class offered to settle with all of the Michigan defendants, including Dykema, for $750,000. Karon reported the settlement offer to American Home and

recommended a contribution from Dykema to the proposed settlement pool of approximately $100,000. American Home, however, refused to grant settlement authority at that figure but suggested possible authority of $75,000. The *Barker* plaintiffs' counsel flatly rejected the $75,000 figure and told Karon that it would no longer entertain settlement discussions with Dykema. In its report to American Home after these initial settlement discussions, Karon noted: "If Dykema could have escaped entanglement in this complex lawsuit for a contribution of one-third of its anticipated cost of defense it would have represented a clear victory for the firm."

Approximately five months later, however, the *Barker* plaintiffs did again offer to settle with Dykema, this time for the sum of $475,000. In November of 1980, Karon once again conveyed the settlement offer to American Home and sought settlement authorization up to the sum of $250,-000. American Home once again refused to grant authority to settle for any sum greater than $75,000.

### D. *American Home Questions Coverage.*

In February of 1982, Karon learned that American Home had retained another law firm, Conklin and Adler, Ltd. to review Karon's file on the *Barker* lawsuit. (Conklin and Adler represents American Home in this action.) Conklin and Adler indicated to Karon that it might recommend that further efforts be made to settle the *Barker* lawsuit.

Neither American Home nor Conklin and Adler informed Dykema at this time that any question of Dykema's coverage under the American Home policy had arisen. Apparently, however, it had, for in January of 1982, Conklin and Adler wrote to American Home stating that "a serious question of policy period" had arisen from their initial review of the *Barker* lawsuit. (Conklin and Adler admitted, however, that it had never examined the policy issued to Dykema and that its comments were based on its "understanding of the general form

which such policies take.") Conklin and Adler advised American Home that the *Barker* complaint concerned Dykema's activities between March of 1977 and April of 1978. Since American Home's policy expired August 19, 1977, Conklin and Adler reasoned, some other policy "ought to at least contribute to the coverage of the alleged loss." It was in apparent response to this advice that American Home directed Conklin and Adler to review Karon's file on the *Barker* litigation.

In February of 1982, Conklin and Adler wrote to Karon stating that it had been retained by American Home "to represent their interests" and directing Karon thereafter to submit all reports concerning the *Barker* litigation to it. This letter, however, did not apprise Karon of any coverage issue.

On August 26, 1982, Karon met with Conklin and Adler. At this meeting Conklin and Adler for the very first time raised the issue of whether Dykema was covered by the American Home policy for its liability under the *Barker* complaint. On September 1, 1982, Conklin, on American Home's behalf, met with Gregory Kopacz of Dykema and an attorney representing Northbrook. Conklin for the first time directly revealed the policy limitations claimed by American Home to preclude, at least in part, coverage of Dykema's liability. At this meeting Conklin suggested a formula whereby American Home would be responsible for only $5/13$ of any settlement amount and claim expenses. At this same meeting American Home attempted to discharge Karon and bar its further participation in the *Barker* lawsuit.

### E. *Settlement of the Barker lawsuit.*

On July 23, 1982, a stay of discovery which had been in effect in the *Barker* litigation for nearly 18 months was lifted. At the urging of the trial court to pursue settlement, Dykema wrote to Conklin advising it that "now would be the propitious time to begin negotiations in earnest." The *Barker* plaintiffs subsequently demanded $750,000 to settle against Dykema

only, such offer to remain open for two weeks only. Karon advised American Home that in light of Dykema's potential exposure to a multi-million dollar verdict, "efforts [should] be made to extricate Dykema for an amount up to the $750,000 demand." American Home did not respond to either Karon's advice or the settlement offer prior to its expiration date.

The *Barker* plaintiffs renewed the settlement offer on August 16, 1982. Karon once again wrote to Conklin and Adler reiterating its belief that settlement should be pursued.

At Dykema's request, Karon pursued negotiations with the *Barker* plaintiffs. The claims were finally settled for the amount of $612,500. American Home contributed $306,250 towards the settlement without prejudice to its right to contest coverage. Northbrook, by virtue of a loan receipt agreement with Dykema, contributed an additional $306,250. Dykema was granted leave by the trial court in *Barker* to pay one-half of Karon's fees (upon refusal to do so by American Home) without prejudice to its right to seek reimbursement.

## II. *Discussion*

### A. *Choice of Law.*

■ The Court's jurisdiction in this matter is founded upon 28 U.S.C. § 1332. In such a diversity action, the Court is required to apply the law of the state in which the Court sits, including the forum state's choice-of-law rules. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Conflict rules are examined, however, only when a difference in law will make a difference to the resolution of an issue. *International Administrators, Inc. v. Life Insurance Co. of North America*, 753 F.2d 1373, 1376 n. 4 (7th Cir.1985). On issues about which there is no disagreement amoung the contact states, a federal court will apply the law of the forum state. *Id.* Finally, the choice-of-law inquiry must be made for each issue separately. *Id.*

The Court will first determine which law controls the dispute between American Home and Dykema. Under Illinois law, the factors that determine which law should be applied to insurance contract disputes are the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a relationship to the general contract. *Hofeld v. Nationwide Life Insurance Co.*, 59 Ill.2d 522, 528, 322 N.E.2d 454 (1975) (citing 12 Appleman, Insurance Law and Practice sec. 7074 (1943)).

Here, Dykema is a Michigan partnership engaged in the practice of law, primarily in Michigan. American Home is a New York corporation with its principal place of business in New York. The last act to give rise to the insurance contract between American Home and Dykema was the countersignature by American Home's agent, which took place in Michigan. In short, Michigan would appear to be the state with the most significant stake in the resolution of the insurance coverage dispute.

Nevertheless, American Home has argued that since the public policy of Illinois would preclude coverage of Dykema for the unlawful conduct alleged by the *Barker* plaintiffs, then this Court must apply Illinois law. More particularly, American Home argues that because (1) the *Barker* complaint sought punitive damages, and (2) the settlement sum of $612,500 did not specify whether the payment represented compensatory or punitive damages, then the Illinois policy prohibiting insurance coverage for punitive damages precludes Dykema's coverage for its liability in the *Barker* lawsuit.

■ American Home's reliance on this Illinois public policy is misplaced. Illinois public policy has little or no bearing on this lawsuit. Except for the fact that Northbrook's principal place of business is in Illinois, Illinois has no stake whatsoever in the outcome of this case. *See International Administrators, Inc. v. Life Insurance Co. of North America*, 753 F.2d at 1377 n. 4 ("Even if the Illinois policy [according insurance company a statutory privilege] is

a strong one, it is hard to see why Illinois policy comes into the picture at all."); *Aetna Casualty & Surety Co. v. Enright*, 258 So.2d 472 (Fla.App.1972) (Florida public policy did not apply where insurance policy in dispute was issued to a New York resident in New York).

■ Moreover, American Home has offered no evidence to show that the *Barker* settlement figure included a sum for punitive damages. In the absence of such a showing, Illinois' policy prohibiting insurance coverage for punitive damages should play no part in the determination of whether and to what extent Dykema was covered under the American Home policy. *Cf. Space Conditioning, Inc. v. Insurance Co. of North America*, 294 F.Supp. 1290, 1296 (E.D.Mich.1968) *aff'd* 419 F.2d 836 (6th Cir. 1970) (the fact that verdict against the insured was a general one and may have included damages not covered by insurance policy was no defense to action against the insurer by insured for wrongfully refusing defense of the initial action).

Finally, American Home has misapplied the Illinois policy. In *Beaver v. Country Mutual Insurance Co.*, 95 Ill.App.3d 1122, 51 Ill.Dec. 500, 420 N.E.2d 1058 (5th Dist. 1981), the Illinois appellate court held that Illinois public policy prohibits insurance for punitive damages arising out of one's own conduct. The Illinois court specifically noted, however, that the holding in *Beaver* did not affect the earlier ruling in *Scott v. Instant Parking, Inc.*, 105 Ill.App.2d 133, 245 N.E.2d 124 (1st Dist.1969). In *Scott* the court held that an employer may insure itself against vicarious liability for punitive damages assessed against it as a result of its employee's wrongful conduct. The *Beaver* court explained the rationale behind *Scott:*

> "In these cases a factor not always focused upon, yet of crucial importance, is the point that if the employer did not participate in the wrong, the policy of preventing the wrongdoer from escaping the penalties for his wrong is inapplicable."

95 Ill.App.3d at 1125, 51 Ill.Dec. 500, 420 N.E.2d 1058, quoting from *Northwestern National Casualty Co. v. McNulty*, 307 F.2d 432, 439–40 (5th Cir.1962).

■ Illinois courts have yet to address specifically the issue of whether Illinois public policy prohibits insurance of a partnership for the punitive damages resulting from one of its partner's wrongdoing. The arguments that can be made on both sides of the issue are obvious. In the absence of clear Illinois authority precluding a partnership's coverage, however, this Court will not find that a law firm cannot insure itself against liability for punitive damages assessed by reason of a partner's wrongdoing.

■ In any event, Illinois public policy does not prohibit the application of Michigan law to the dispute between Dykema and American Home. Therefore, based upon the various factors properly considered in resolving the issues of the Dykema-American Home dispute, the Court will apply Michigan law.

The Court is similarly convinced that Michigan law controls resolution of the dispute between American Home and Northbrook. Both parties insured a risk located in Michigan; Michigan's interest in the insurance coverage of its residents is the most significant state interest in this case. Michigan law, therefore, governs resolution of the dispute between American Home and Northbrook.

B. *The Merits of the Parties' Respective Motions.*

American Home's motion only seeks summary judgment with respect to apportionment of liability between American Home and Northbrook. Dykema's and Northbrook's motion for summary judgment seeks, *inter alia*, a determination of American Home's obligations to Dykema. The Court will address this latter issue first.

1. *American Home is Estopped from Denying Coverage to Dykema.*

As explained above, when Dykema tendered defense of the *Barker* lawsuit to

American Home, the insurance company accepted the defense, but reserved the right "to set forth at a future time those claims and/or judgment rendered against you which are not covered by your insurance policy," if discovery or "other procedures" revealed problems with coverage. American Home maintains that this paragraph, included in a letter dated December 6, 1979, preserved its right to assert grounds for noncoverage through August of 1982 when it finally did assert such grounds.

 American Home is mistaken. Under either Michigan or Illinois law, American Home is estopped from denying coverage to Dykema more than two and one-half years after litigation commenced and more than seven months after Conklin and Adler apprised American Home that a policy period issue existed.

Under Michigan law, when even a mere possibility of a conflict of interest arises between an insurer and an insured, an insurer must act "promptly and openly, on peril of estoppel" to protect the rights of both the insured and the insurer. *Meirthew v. Last,* 376 Mich. 33, 135 N.W.2d 353 (1965). In *Meirthew,* plaintiff had won judgment in a suit arising out of a car accident. When he was unable to collect against the defendant in that action, he sued in garnishment against defendant's insurer. The insurer sought to avoid liability for the judgment on the basis of a "Reservation of Rights" letter it had sent to its insured more than two and one-half years after hiring counsel to represent it and its insured. The letter stated in relevant part as follows:

> [T]he Company in undertaking your defense, does so under a reservation of rights, and without prejudice, and subject to the conditions, limitations, exclusions and agreements of said policy, and subject to the express understanding that by so doing the Company does not waive any of its rights to rely upon the provisions of said policy, and does not waive any defense it may have to any claimed liability under said policy.

135 N.W.2d at 355. After three years of litigation, the insurance company sought to avoid coverage by reason of a "Risks Excluded" clause in the insurance policy. The Michigan Supreme Court held that the notice was legally insufficient, vague, uncertain and too late. The reservation, the Court held, "smack[ed] of bad faith for want of a specific reference" to the clause in the contract upon which the insurer intended to rely to deny coverage. *Id.* at 355. The Michigan Court, in summarizing, held that the insurer's notice was

> unreasonably and prejudicially tardy. It failed [the "reasonableness"] test because it left [the insured] in the dark as to the nature of the policy defense or defenses the insurer had in mind; if indeed it had any in mind save such as might be conceived later as the principal case proceeded.

135 N.W. at 356. The Court explained the reason for its holding:

> In no field of law is legal duty more rigidly enforced than in instances as at bar. The insurer must fulfill its policy-contracted obligation with utmost loyalty to its insured; not for the purpose of developing, secretly or otherwise, a policy defense.

*Id.* at 355.

American Home's reservation of rights in its December 6, 1979 letter, and its subsequent attempt in August of 1982 to deny coverage, are similarly defective. The 1979 letter did not refer to any aspect of the insurance policy upon which American Home hoped to avoid coverage of the *Barker* claims. Both the first and third amended complaints in the *Barker* lawsuit should have apprised American Home of the time period during which Dykema was alleged to have acted unlawfully. American Home was on notice as early as November of 1979 of the defense to coverage which it did not assert until August of 1982.

American Home's conduct is particularly egregious in light of the advice it received from Conklin & Adler in January of 1982 to the effect that a policy period issue existed. Instead of notifying Dykema or Karon,

American Home chose to stall settlement while it indeed "secretly" developed a policy defense. Such behavior cannot be tolerated and American Home is estopped under Michigan law from denying coverage.[2]

This result, however, does not turn on the application of Michigan law (which, as discussed above, governs this dispute) since the outcome would be the same under Illinois estoppel doctrine. In Illinois, a party claiming the benefit of an estoppel must prove "reasonable reliance upon the acts or representations of the party sought to be estopped, without knowledge of a convenient means of learning the true facts." *National Ben Franklin Insurance Co. v. Davidovitch*, 123 Ill.App.3d 88, 93, 78 Ill. Dec. 577, 462 N.E.2d 696 (1st Dist.1984) (insurer's representation of doctor in a malpractice lawsuit for over two years before notification of withdrawal, doctor's reliance thereon in not hiring separate counsel, and insurer's decision not to settle until more than two years of litigation created an estoppel). If an insurer's assumption of the defense induces the insured to relinquish his right to control his own defense, the insured has suffered the requisite prejudice. *See, e.g., Textile Machinery, Inc. v. Continental Insurance Co.*, 87 Ill.App.3d 154, 157, 42 Ill.Dec. 506, 409 N.E.2d 1 (1st Dist.1980) (when insurer did not assert lack of policy coverage until more than two and one-half years after it undertook defense on behalf of its insured and retained a law firm to represent insured, insurer was estopped to deny coverage).

In this case, Dykema reasonably relied on American Home's representations and conduct in initially assuming the defense and continuing the control of the *Barker* lawsuit. Dykema reasonably believed that American Home's policy insured Dykema for the misconduct alleged in the *Barker* complaint. Dykema did not know of any "true facts" that could preclude coverage under the policy. Indeed, American Home has not even attempted to argue that the law firm should have known it was not covered. Finally, American Home's failure to authorize settlement of the *Barker* litigation on terms significantly more favorable than the ultimate $612,500 figure establishes the prejudice Dykema suffered.

In sum, American Home's reprehensible abrogation of its responsibility to its insured estops it now from denying full coverage of American Home's involvement in the *Barker* lawsuit. Summary judgment will be granted to Dykema and denied to American Home on this issue. American Home is liable under its policy to Dykema for the costs, attorneys' fees and other expenses incurred by Dykema in connection with its defense in the *Barker* lawsuit.

## 2. American Home is Solely Liable for the Claims and Expenses of the Barker Lawsuit.

A thornier problem is presented by the issue of to what extent, if any, Northbrook is liable for the claims and expenses of the

---

**2.** The Court is aware of the Michigan appellate court's decision in *Schimmer v. Wolverine Insurance Co.*, 54 Mich.App. 291, 220 N.W.2d 772 (1974), distinguishing *Meirthew*. In *Schimmer*, plaintiff sought to recover from her insurance company the attorneys' fees she incurred in defending a suit against her by purchasers of a property she had sold. The property had been specifically deleted from the insurance policy, however, sixteen months before plaintiff was served in the underlying action and the insurance company had declined plaintiff's tender of defense.

The trial court denied plaintiff leave to amend her pleadings to assert that the insurance company was estopped to deny coverage. On appeal, plaintiff cited *Meirthew* as the case upon which her estoppel argument was founded. The

appellate court held that *Meirthew* was inapplicable to the case before it since *Meirthew* involved an insurer's appeal to exclusionary clauses in the policy itself, whereas plaintiff's insurer (like American Home here) claimed that no policy coverage existed at all.

No facts supported Schimmer's estoppel argument. Her insurer did not lull her into believing that it would cover the claims against her and she did not rely to her detriment on any words or conduct of her insurer. Moreover, *Schimmer*'s distinguishing of *Meirthew* on "exclusionary clause versus policy coverage" grounds has never been followed by any other Michigan court. In sum, this Court believes that the Michigan Supreme Court would follow its rationale in *Meirthew* and not that set forth in *Schimmer* in deciding the issue *sub judice*.

*Barker* lawsuit. As an initial matter, a comparison of the two policies is in order.

The insurance policy which American Home issued to Dykema in August of 1976 provided, in relevant part, as follows:

> [American Home agrees t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of any act or omission of the insured, or of any other person for whose acts or omissions the insured is legally responsible, and arising out of the performance of professional services for others in the insured's capacity as a lawyer....

> \* \* \* \* \* \*

> [American Home shall] (a) defend any suit against the insured alleging such act or omission and seeking damages which are payable under the terms of this policy, even if any of the allegations of the suit are groundless, false or fraudulent but the company may make such investigation and, with the written consent of the insured, such settlement of any claim or suit as it deems expedient; and (b) pay, in addition to the applicable limits of liability:

> (1) all expenses incurred by the company, all costs taxed against the insured in any such suit and all [post-judgment] interest....

> (3) all reasonable expenses other than loss of earnings, incurred by the insured at the company's request.

▇▇▇▇ The parties agree that the American Home policy should be characterized as an "occurrence policy." By its terms the American Home policy applied to "acts or omissions ... [committed] during the policy period...." An occurrence policy is one in which the insured is indemnified for acts or occurences which take place within the policy period regardless of when the claim is made. *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 535 n. 3, 98 S.Ct. 2923, 2926 n. 3, 57 L.Ed.2d 932 (1976). It differs from a "claims made"

policy is that the latter type indemnifies the insured only for those claims which are asserted during the policy period.[3]

The Northbrook policy was a "claims made" policy. It obligated Northbrook

> [t]o pay on behalf of the Insured all sums in excess of the deductible amounts stated in the Declarations which the Insured shall become legally obligated to pay as damages as a result of the CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD:

> (a) by reason of any act, error or omission in professional services rendered or that should have been rendered by the Insured or by any person for whose acts, errors or omissions the Insured is legally responsible, and arising out of the conduct of the Insured's profession as a lawyer or notary public:

> \* \* \* \* \* \*

> PROVIDED ALWAYS THAT such act, error or omission or such personal injury happens:

> (a) during the policy period; or

> (b) prior to the policy period provided that prior to the effective date of this policy:

> \* \* \* \* \* \*

> 3. there is no prior policy or policies which provide insurance for such liability or claim. If coverage is otherwise afforded under this policy and if the available limits of liability of such prior policy or policies are insufficient to pay any liability or claim, this policy will be excess over any such prior coverage.

By its terms, therefore, Northbrook's policy provided primary "claims made" coverage for acts committed during the policy period and for acts committed prior to the effective date of the policy if no other coverage for those acts existed. Northbrook was only an excess insurer for any acts which occurred prior to the policy's

---

**3.** The Court notes that actually the American Home policy was something of a hybrid since it also covered acts or omissions committed "prior to the policy period if claim is made or suit is brought against the insured during the policy period...."

effective date and which were covered by prior insurance.

■ Northbrook initially has argued that American Home owed Northbrook, as the excess insurer, the same duty to bargain in good faith as it owed Dykema. Having clearly breached this duty, Northbrook contends, American Home is solely and fully responsible for all of the costs, expenses and settlement of the *Barker* lawsuit.

In support of this argument, Northbrook has relied upon a line of cases which hold that a primary insurer has a duty to the excess insurer to settle in good faith within the policy limits of the primary coverage. *See e.g., Vencill v. Continental Casualty Co.,* 433 F.Supp. 1371, 1375 (S.D.W.Va. 1977). The reasons for holding a primary insurer to the same high standard of conduct with respect to the excess carrier as is owed to the insured have been succinctly stated as follows:

> [These reasons] include the encouragement of settlements when an offer exists at or near the policy limits, discouraging gambling with the excess carrier's money, hoping to keep excess liability insurance premiums low, reducing the necessity for the excess carrier to participate in the defense of the action to protect its rights, and reflecting the duties of the primary carrier to perform the duty which it has delegated to itself, that is, providing primary coverage.

R. Long, *The Law of Liability Insurance,* § 5.63, at 5–472 (1980).

Northbrook's reliance on this line of analysis, however, is misplaced here. First, American Home contends that Northbrook was the primary insurer for at least eight months of the period during which Dykema allegedly committed malpractice, and thus any duty a primary insurer owes to an excess insurer is not applicable. Furthermore, although American Home certainly acted in bad faith in refusing to settle with the *Barker* plaintiffs, the final settlement figure was well below the $2,000,000 policy limit. Although the parties have not yet submitted data concerning Karon's fees, the Court assumes that they did not exceed $1,387,500, (the amount which, when added to the settlement figure, would total $2,000,000). In short, although American Home breached many of its contractual duties, it did not breach the duty sought to be enforced here by Northbrook, *i.e.,* the duty to attempt to settle within the policy limits of the primary insurer. American Home's breach did not affect Northbrook in its role as excess insurer.

It may well be that American Home, at this late date, should be estopped from essentially "passing the buck" to Northbrook. The parties have not cited any authority for this point, however, and the Court has been unable to locate any. Moreover, the record is silent as to what notification American Home provided to Northbrook when it determined that an issue of policy period existed and whether Northbrook relied to its detriment on any conduct of American Home. The Court believes it is necessary, therefore, to analyze the terms of the two policies at issue in order to determine whether, and to what extent, Northbrook is responsible for all or a portion of the *Barker* settlement and other litigation expenses.[4]

---

**4.** American Home has advanced at least five different theories of proration. Its earliest position, one developed by Conklin and Adler, was that since the *Barker* complaint alleged misconduct by Dykema over a thirteen month span, and since American Home's policy had been in effect for only five of those thirteen months, then American Home was responsible for only ⁵⁄₁₃ of the ultimate settlement and claims expenses. Next, American Home argued that responsibility should be prorated according to the time period when the securities at issue in *Barker* were sold. Since only 65.9% of the notes

were sold during the period of American Home's policy, under this theory American Home would be responsible for only 65.9% of the litigation's expenses and settlement. Third, American Home has argued that it and Northbrook's policies provided concurrent coverage and that liability should be prorated according to the policies' respective coverage limits. Since American Home's policy provided coverage up to a limit of $2,000,000 and Northbrook's up to $10,000,000 under this theory American Home would be liable for only one-sixth of the total settlement and litigation expenses. Fourth,

The primary issues to be resolved are first, whether Dykema's alleged malpractice constituted a single occurrence, act or omission; and second, when did Dykema's alleged malpractice occur. If the malpractice was one act or omission (an "occurrence") which took place during the period of American Home's coverage, then American Home is responsible for any sums generated by the *Barker* lawsuit up to its policy limit. If multiple occurrences took place over the course of both the American Home and Northbrook policies, then liability must be prorated. If the alleged malpractice occurred after the expiration of American Home's policy, then Northbrook is solely responsible as the primary insurer.

### a. *Single or Multiple Occurrences.*

■ The Court is convinced (and indeed American Home appears not to dispute) that Dykema's alleged malpractice constituted only one act or omission for purposes of policy coverage. The case most directly on point is *Pioneer National Insurance Co. v. Andrew*, 652 F.2d 439 (5th Cir.1981). In *Pioneer* a title insurance company brought suit against an attorney and his insurers for malpractice committed during a title search of Florida property. The attorney issued three letters of certification during the course of his search. Sometime between issuances of the second and third certification letters, the attorney changed malpractice insurance carriers. The district court held, and the appellate court affirmed, that although three letters had been issued, the attorney's negligence was a "single, continuing act" since both the attorney and the title insurance company had relied on the first two certificates.

The first insurer (who was American Home) was held liable to the full extent of its policy limits and the second insurer was held responsible for the remainder of the title insurance company's damages.[5]

Similarly, in *Aetna Casualty & Surety Co. of Illinois v. Medical Protective Co.*, 575 F.Supp. 901 (N.D.Ill.1983), Judge Hart of this Court held, for purposes of determining the limits of the insurer's liability, that a doctor's malpractice over the course of two years constituted a single occurrence. Judge Hart noted that "[a] series of related injuries comprise a single 'ocurrance' for the purposes of an insurance contract, where they all flow from a single cause." *Id.* at 903.

Finally, the Tenth Circuit recently predicted that Oklahoma would follow the general rule that "an occurrence is determined by the cause or causes of the resulting injury" to find that an employee's embezzlement over a seven-month period was a single occurrence. The lower court found and the Tenth Circuit affirmed that " 'the probable intent of the employee with regard to the last thirty-nine checks [was] essentially the intent to continue the dishonesty, not to commit an entirely new and different act of dishonesty.' " *Business Interiors, Inc. v. Aetna Casualty and Surety Co.*, 751 F.2d 361, 363 (10th Cir. 1984) (quoting from district court opinion).

In the same way, Dykema's malpractice as alleged by the *Barker* plaintiffs constituted a single occurrence of negligence—its failure to disclose material facts concerning the financial state of the Foundation or to advise the Foundation to discontinue the sale of the notes. Although the

American Home has argued that since the securities at issue in the *Barker* lawsuit were not due to mature until after the expiration of the American Home policy, then Northbrook is solely responsible for the expenses and settlement of the litigation. Finally, as discussed earlier in the text of this opinion, American Home argued that since the $612,500 settlement might have included a sum to settle the punitive damage claim in *Barker,* then Illinois law precludes any recovery against it whatsoever.

5. Unfortunately, Pioneer does not dispose of the case *sub judice* since *Pioneer* does not discuss on what basis the second insurer was held partially liable. Since the first insurer was held liable to the full extent of its policy coverage, it seems likely that the second insurer was an excess insurer. American Home has argued, however, that the lower court in *Pioneer* did not think that the finding of a single occurrence was dispositive of the issue of proration between the insurers, and that the lower court prorated liability between the insurers according to some undisclosed formula.

*Barker* complaint alleges many acts allegedly committed by Dykema (and in particular by Ronald Rose), the gist of the complaint is that Dykema learned of the grave legal and financial state of the Foundation and the illegal sale of its notes shortly after being retained, failed to take proper action at that time and continued to suppress important information for over a year. These alleged acts and omissions constituted one occurrence of professional malpractice under the American Home policy.

The Court realizes that this holding could be construed upon a cursory review to be at odds with that in *Elston-Richards Storage Co. v. Indemnity Insurance Co.,* 194 F.Supp. 673 (W.D.Mich.1960), *aff'd,* 291 F.2d 627 (6th Cir.1961).[6] In *Elston-Richards* the court held that damage by a hydraulic clamp device to several thousand whirlpool appliances over a period of nine months constituted numerous "occurrences" for purposes of interpreting the limits-of-liability provision of the insurer's policy. The court in *Elston-Richards* rejected plaintiff's contention that the damage from one cause to the separate appliances constituted a single event or occurrence. The court held that each "accident" to each appliance constituted a single event or occurrence.

*Elston-Richards* is not only factually distinguishable from this case, but the Sixth Circuit also appears to have recently moved away from the reasoning of the *Elston-Richards* court. In *Michigan Chemical Corp. v. American Home Assurance Co.,* 728 F.2d 374 (6th Cir.1984), the Sixth Circuit decided that only one occurrence took place when farmers sustained property damage as a result of the distribution of contaminated livestock feed in Michigan. The insurance policies at issue contained language very similar to that interpreted in *Elston-Richards.* Illinois law was applied,

however, to resolution of the insurance coverage issue. The Sixth Circuit noted:

> The vast majority of courts ... have concluded that although injury must be suffered before an insured can be held liable, the number of occurrences for purposes of applying coverage limitations is determined by reference to the cause or causes of the damage and not to the number of injuries or claims.

> \* \* \* \* \* \*

> We are aware of only one case which calculated the number of occurrences by referring to the number of injuries rather than to the cause or causes of those injuries. *See Elston-Richards Storage Co. v. Indemnity Insurance Co. of North America,* 194 F.Supp. 673, 678–82 (W.D.Mich.1960), *aff'd,* 291 F.2d 627 (6th Cir.1961). Although this court decided *Elston-Richards,* the holding is not binding because the current litigation involves Illinois law. We are persuaded that if the Illinois courts were presented with the current case, they would follow the overwhelming majority of decisions which have held that the number of occurrences is determined by examining the cause or causes of the damage.

728 F.2d at 379–80. The appropriate inquiry, the court held, was whether there was " 'but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damages.' " 728 F.2d at 379, quoting from *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.,* 676 F.2d 56, 61 (3d Cir.1982).

In the absence of any Michigan authority directly on point, this Court must predict how Michigan courts would resolve this issue. The Court believes that Michigan would follow what the Sixth Circuit called the "overwhelming majority of decisions" that apply the "cause" analysis in determining whether one occurrence or multiple

**6.** Although the *Elston-Richards* opinion did not state that it applied Michigan law to reach its result, the plaintiff was a Michigan corporation with its principal place of business in Michigan. Defendant was a Pennsylvania corporation authorized to do business in Michigan and the

opinion cites to Michigan state cases. It is apparent, therefore, that the opinion represents an interpretation of Michigan law which, as discussed *supra,* controls the Court's decision in this case.

occurrences have taken place for purposes of determining insurance coverage. Under such an analysis, Dykema's alleged malpractice comprised only a single, uninterrupted and continuing cause which resulted in the harm alleged by the *Barker* plaintiffs.

#### b. *Time of the Occurrence.*

■ Next, the Court must resolve the critical issue of when the alleged malpractice occurred. As noted by the leading case in the area, "While the 'cause' test is appropriate for determining whether there is a single occurrence or multiple occurrences, it is not applicable in determining when an occurrence takes place." *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.*, 676 F.2d 56, 61 (3d Cir. 1982). The *Appalachian* court held, and other courts have followed, that "the determination of when an occurrence happens must be made by reference to the time when the injurious effects of the occurrence took place." *Id.* at 61–62.[7] Under this analysis, the Third Circuit held that an employer's discriminatory conduct "occurred" at the time when the injuries first manifested themselves, *i.e.*, immediately upon the promulgation of the employer's discriminatory policies. Since this occurrence preceded the effective date of insurance coverage, the insurer was not liable for the employer's loss.

American Home contends that since the notes at issue in the *Barker* lawsuit were not scheduled to mature until after the expiration of American Home's policy, then the *Barker* plaintiffs were not actually injured until then. In support of its argument, American Home relies entirely upon *Arizona v. Glen Falls Insurance Co.*, 125 Ariz. 328, 609 P.2d 598 (Ariz.App.1980). In *Glen Falls*, the Arizona court found that

depositors of two thrift associations which were eventually ordered into federal receivership were not actually (as distinguished from potentially) injured until a depositor was unable to withdraw funds, despite the fact that the liabilities of the thrift associations had exceeded its assets continuously for at least four years before that time. The State's insurance carriers for the period of time prior to the federal receivership, therefore, were not liable for the alleged failure of the State to regulate and supervise the thrift institutions. By analogy, American Home argues, the *Barker* plaintiffs did not suffer any actual damage until March 31, 1978, the date when the Foundation first informed the security holders that all payments then due had been suspended.

American Home has disregarded entirely the injury suffered by the *Barker* plaintiffs by reason of their *purchase* of the Foundation's securities. The third amended class action complaint clearly specifies what injury the *Barker* plaintiffs allegedly suffered, the injury which this Court must assume was meant to be compensated by the $612,500 settlement. The *Barker* complaint charges that the defendants' conduct led to plaintiffs' (a) purchase of the notes and bonds, (b) purchase of the notes and bonds at prices substantially higher than what they would have borne but for defendants' conduct, and (c) retention of the notes and bonds which otherwise would have been sold by the plaintiffs but for defendants' conduct (¶ 92). The *Barker* plaintiffs were allegedly injured by Dykema, therefore, immediately after the law firm learned of material facts concerning the Foundation's legal and financial situation and failed to disclose that information to the proper parties. This alleged omission occurred, according to the *Barker* complaint, shortly

---

**7.** It is noteworthy that the insurance policy at issue in *Appalachian* defined "occurrence" as an "accident ... which unexpectedly and unintentionally *results* in personal injury, property damage or advertising liability *during the policy period.*" 676 F.2d at 58 n. 8 (emphasis added). Most "occurrence" policies appear to contain such language, *i.e.* defining occurrence by reference to when the injury is manifested. Ameri-

can Home's policy contains no such defining language; rather, it appears to cover any acts or omissions which occur during the policy period, regardless of when the resulting injury manifests itself. By conceding that the American Home policy is an occurrence policy, however, the parties have been forced into having to deal with the issue of when Dykema's alleged malpractice took place.

after Dykema was retained by the Convention in March of 1977, *i.e.*, during the period of American Home's insurance coverage.

In sum, American Home and not Northbrook was liable for resolution of the claims brought in the *Barker* lawsuit against Dykema. Northbrook, like Dykema, is entitled to reimbursement from American Home for the costs, fees and expenses it incurred in connection with resolving Dykema's involvement in the *Barker* litigation.

### 3. *Attorneys' Fees Relating to this Action.*

▉ Finally, defendants have requested the Court to declare that American Home must reimburse Dykema and Northbrook for all costs, expenses and attorneys' fees incurred in connection with this declaratory judgment action. The established rule in Michigan, however, is that the insured "may not be allowed attorney's fees in excess of taxable costs for the declaratory action to enforce insurance coverage." *Shepard Marine Construction Co. v. Maryland,* 73 Mich.App. 62, 250 N.W.2d 541 (Mich.App.1976); *accord Iacobelli Construction Co. v. Western Casualty & Surety Co.,* 130 Mich.App. 255, 343 N.W.2d 517, 522–23 (Mich.App.1983). Each party to this action, therefore, must pay its own attorneys' fees.

### III. *Conclusion*

For the reasons set forth herein, American Home's motion for summary judgment is DENIED. The motion of Dykema and Northbrook for summary judgment is DENIED to the extent that it seeks attorneys' fees incurred in connection with this declaratory judgment action and is GRANTED in all other respects.

### SUPPLEMENTAL OPINION AND JUDGMENT ORDER

Pursuant to the Court's Order of August 20, 1985, Dykema and Northbrook (collectively "counterplaintiffs") submitted a proposed judgment order. American Home objected to the proposed order on three grounds: (1) Dykema sought reimbursement of certain fees paid to Arnstein, Gluck, Lehr, Barron & Milligan ("Arnstein"), counsel for counterplaintiffs in this action; (2) counterplaintiffs failed to establish the reasonableness of the fees paid to Karon in connection with the *Barker* lawsuit; and (3) counterplaintiffs sought prejudgment interest under Michigan law. On November 12, 1985 this Court provided the parties the opportunity to present their respective positions at a hearing on the second issue raised by American Home—the reasonableness of Karon's fees. Subsequent to this hearing the parties submitted detailed copies of Karon's billing statements, American Home's objections thereto, and briefs concerning those objections. The Court is now in a position to enter judgment in this case.

### 1. *Arnstein's fees.*

▉ In its Order of August 20, 1985, this Court held that Dykema and Northbrook were not entitled to reimbursement of the attorneys' fees incurred in connection with this declaratory judgment action. *See* Memorandum Opinion and Order, August 20, 1985, pp. 32–33. Counterplaintiffs' proposed judgment order includes, however, a provision for payment to Dykema by American Home of the sum of $20,850.35 (plus interest) "as reimbursement of Dykema's payment of fees to the firm of Arnstein, Gluck, Lehr, Barron & Milligan for representation of Dykema in the *Barker* lawsuit."

American Home contends that Dykema's attempt to obtain part of Arnstein's fees for its purported involvement in the *Barker* lawsuit is a blatant ruse to circumvent the Court's ruling that the counterplaintiffs could not recover their attorneys fees for services performed in connection with this declaratory judgment action. American Home argues that during the course of the *Barker* litigation Dykema consistently expressed satisfaction with Karon's services, and thus had no reason to retain Arnstein in connection with the *Barker* litiga-

tion. American Home also believes that it should not have to bear the cost of two sets of attorneys' fees, especially when (American Home argues) a review of the billing invoices indicates that Arnstein merely duplicated work already performed by Karon.[1]

Dykema has submitted the affidavits of Gregory Kopacz (a member of the Dykema firm) and Eugene Kelley (a member of the Arnstein firm) in support of its claim for a portion of Arnstein's fees. These affidavits set forth the circumstances under which Arnstein was hired to represent Dykema. Excerpts from portions of Kelley's affidavit suffice to tell the story:

> When our firm was retained to represent Dykema, we were advised and did in fact determine that Dykema had been placed in a position of serious peril in the *Barker* lawsuit.
>
> American Home and the Conklin firm had sought to discharge the firm of Karon, Morrison & Savikas ("Karon"), whom American Home had long ago hired to represent Dykema. American Home and the Conklin firm refused to even communicate with the Karon firm. . . .
>
> At this point, American Home would not permit Karon to negotiate Dykema's involvement of the underlying action to a conclusion. It would not communicate with Karon at all.
>
> Thus, at that time and in the weeks that followed, we were presented with a situation whereby American Home would not permit Dykema to select its own counsel, and would not communicate with the counsel whom it had selected for Dykema.

\* \* \* \* \* \*

On Dykema's behalf, I had a number of contacts with the Conklin firm, Northbrook and Karon. I also attended a pre-trial conference for the *Barker* lawsuit. . . .

\* \* \* \* \* \*

Someone had to bring *all* of the parties together. I had to do the negotiating. I was therefore in contact with the Conklin firm and Northbrook, as well as the Karon firm and plaintiffs' attorney. I also initiated and participated in drafting of settlement papers.

The Conklin firm was quite well aware of the major role that I was forced to play in resolving the underlying action. I spoke with partners of the Conklin firm. I am quite sure that they recall our discussion.

The Court is convinced that Arnstein was retained by Dykema to aid in the settlement of the *Barker* lawsuit in addition to representing Dykema in this action, and that Dykema's action was made necessary by American Home's refusal to communicate with Karon, the firm it had hired to represent Dykema in the *Barker* lawsuit. As indicated in correspondence submitted by American Home, a deep rift had developed between Karon and American Home over payment of fees (and, the Court suspects, Karon's growing apprehension after Conklin & Adler was hired to protect American Home's "interests" that American Home might seek to avoid coverage). Even if Dykema was satisfied with Karon's services, the circumstances between all of the parties warranted retaining Arnstein to negotiate the settlement of the *Barker* lawsuit. American Home created those circumstances by failing to disclose that it sought to avoid its obligations under the insurance policy.[2] American Home, there-

---

1. American Home also (and inconsistently) argues that Arnstein's billing statements reflect that the work performed related solely to this declaratory judgment action. Inexplicably, American Home offers as an example research and writing done by Arnstein "regarding right of assured to settle without approval of insurer." Clearly such research pertained to Dykema's desire to settle the *Barker* lawsuit when faced

with American Home's steadfast refusal to grant Karon settlement authority in a reasonable amount. American Home's own example of Arnstein's work, therefore, supports the Court's conclusion that a portion of Arnstein's activities were directed at bringing the *Barker* litigation to a satisfactory resolution.

2. *See* Exhibit E to Reply Memorandum of American Home, letter dated June 7, 1982 from

fore, must bear that portion of Arnstein's fees attributable to its representation of Dykema in the *Barker* litigation.

### 2. *Karon's fees.*

As noted in the Court's August 20, 1985 Order, American Home's insurance policy obligated it to pay "all expenses incurred by the company ... [and] all reasonable expenses other than loss of earnings, incurred by the insured at the company's request." It is undisputed that, pursuant to the Court's August 20, 1985 ruling, the expenses which American Home must pay include at least a portion of the attorneys' fees billed by Karon. American Home challenges, however, the amount sought by Dykema for Karon's fees. American Home has charged (1) that Dykema is seeking reimbursement for fees billed by Karon for services rendered in connection with the dispute between American Home and Dykema (*i.e.,* this lawsuit), the recovery of which was disallowed by this Court's earlier ruling; and (2) Karon's billing for paralegal time was excessive. The Court will treat each objected-to billing statement in turn.[3]

a. *December 9, 1981:* American Home objects to approximately 83 hours of paralegal time spent at various tasks, including organization and interpretation of handwritten notes, updating files, and reviewing documents. American Home has highlighted (signaling an objection) the entries for indexing certain witness files as excessive, but has neither argued nor presented any evidence on the issue of why these witnesses' files, as opposed to any other witnesses' files, should not have tak-

en the stated amount of time to index. The Court finds that the work performed is that customarily done by paralegals in a large law firm practice, and the time allocated to these tasks is not unreasonable.

b. *January 13, 1982:* American Home has objected to various paralegal billing entries, which reflect tasks such as shepardizing cases, filings and obtaining copies of law review articles. The Court's comments with regard to the paralegal time charged in the 12/9/81 billing also pertain here, and the paralegal time will be allowed.[4]

American Home also objects to certain attorney time entries made during December of 1981. Apparently American Home believes that these entries concern matters involved in this lawsuit rather than the *Barker* litigation. Since the complaint in this litigation was not filed until September 1, 1982, and Dykema was not even aware that American Home hoped to avoid coverage until August of 1982, the Court cannot accept American Home's objection. The January 13, 1982 billing will be allowed in full.

c. *February 15, 1982:* The Court's comments with regard to the January 13, 1982 attorney billing entries pertain here also. Many of the attorney time entries objected to on this statement deal with contacts between Karon and counsel for American Home. Since neither Karon nor Dykema understood that American Home sought to avoid insurance coverage as of that date, and counsel for American Home had represented only that it had been retained to

Conklin and Adler to Dykema: "Apparently you are laboring under some misapprehension that the American Home Insurance Company is endeavoring to avoid its obligations to pay for the legal defense of your firm."

**3.** At the hearing on November 12, 1985, American Home raised the issue of the appropriateness of Karon's fees during the period preceding December 9, 1981, particularly the time and fees charged by Karon for paralegal services. American Home submitted copies of Karon's fees for the time period between December 1979 and March of 1981.

All of these fees were fully paid by American Home and no issue regarding their appropriateness was ever raised in American Home's pleadings. The Court believes that the issue of the appropriateness of Karon's fees up until the December 9, 1981 billing, therefore, is not before it.

**4.** Unless otherwise noted, the Court's finding with regard to the reasonableness of Karon's paralegal time entries pertains to each of the billing statements reviewed.

represent American Home's "interest," these fees must still be considered part of the *Barker* litigation costs.

■ d. *March 11, 1982:* The Court's prior comments pertain to this billing statement. American Home's objections to the billing statement focus on "consultations" between Karon and American Home regarding payment of fees. The correspondence submitted by American Home reflects that the fee disputes concerned work done in furtherance of the *Barker* litigation; American Home, therefore, is responsible for the time incurred trying to resolve the fee disputes.

e. *April 12, 1982 through July 9, 1982:* The Court's prior comments pertain to these billing statements.

■ f. *September 28, 1982:* On September 1, 1982, American Home filed its complaint in this lawsuit. On or about that date, Dykema retained Arnstein to represent it in this litigation and, as discussed above, to help settle the *Barker* litigation.

Some of the time billed by Karon during the month of September of 1982 is for reviewing the complaint filed by American Home, researching American Home's position regarding insurance coverage and consulting with members of the Arnstein firm. It is impossible for the Court to ascertain from some of the time entries whether the discussions with Arnstein focused on the merits of the *Barker* litigation, which Arnstein was attempting to resolve, or the merits of this litigation. The Court believes, however, that in its role as counsel for Dykema in the *Barker* lawsuit Karon was obligated to review the initial pleadings in this case, apprise its client of the case, and aid the newly-retained Arnstein in settling the *Barker* lawsuit.

The Court's conclusion is supported by the affidavit of Lawrence A. Wojcik, a member of the Karon firm, which was submitted in response to American Home's objections to the reasonableness of Karon's fees. Mr. Wojcik stated as follows:

> At the time American Home filed its declaratory judgment action against Dykema, we were in the process of attempting to negotiate settlement with the plaintiff class in *Barker*. American Home's disclosure in its pleading in this action of our settlement recommendation in the *Barker* case caused substantial problems with settlement. Bob Plotkin, counsel for the plaintiff class, quickly called to advise that he had reviewed American Home's pleading with great interest and was looking for a settlement figure in the amount disclosed in the pleading.
>
> Because American Home had chosen to go public with what we thought was a privileged attorney/client communication, we were compelled to review any pleadings filed in the declaratory action beforehand to ensure that they would not endanger Dykema's position in the *Barker* litigation. Eugene Kelley, counsel for Dykema in the declaratory judgment action, specifically requested that we review Dykema's filings, in order to preclude the possibility that anything said in the declaratory action would jeopardize Dykema's position in the *Barker* case.

Wojcik affidavit, ¶ 15-16. In short, the pleading American Home filed in this declaratory judgment action sufficiently affected the settlement negotiations of the *Barker* suit to require Karon to review the filings in *this* case. Karon's fees in reviewing the pleadings in this case up until the settlement of the *Barker* lawsuit, therefore, constitute part of the services rendered in connection with the *Barker* case. Karon's fees as reflected on this billing statement, therefore, will be allowed in full.

g. *November 12, 1982:* By far the majority of attorney time entries objected to by American Home on this billing statement reflect services rendered by Karon, along with Arnstein, in connection with attempts to settle the *Barker* litigation. The Court has already determined that American Home must bear both sets of attorneys' fees incurred in those settlement discussions. The remaining objected-to en-

tries, which reflect Karon's apprising itself of the status of this case, fall within the Court's comments on the impact of this case on settlement of the *Barker* litigation. The November, 1982 billing statement will be allowed in full.

h. *December 9, 1982 through February 9, 1983:* All of the objected-to portions of this statement appear to deal with settlement of the *Barker* lawsuit. The fees will be allowed in full.

i. *March 15, 1983:* It appears that the *Barker* settlement agreement was finally executed during the month of March 1983. All of the objected-to portions of this billing statement concern settlement of that lawsuit. The fees will be allowed in full.

j. *April 13, 1983:* All of the objected-to portions of this billing statement concern settlement of the *Barker* lawsuit. The fees will be allowed in full.

k. *June 14, 1983:* Certain billings on this statement appear to relate solely to this declaratory judgment action and will be disallowed. In particular, the following entries will be deducted from Karon's fees:

| | | |
|---|---|---|
| LAW 5/10 | Receipt and review of answer filed by Arnstein, Gluck & Lehr on behalf of Dykema on declaratory action | $28.75 |
| AJM 5/12 | Telephone conference with Paige Cunningham regarding their filing of an answer in the declaratory action | $22.50 |
| RLH 5/26 | Receipt and review of motion of Northbrook for time to respond to complaint, appearances for Northbrook; receipt and review of notice of depositions | $33.75 |

l. *July 9, 1983:* One entry by "RLH" on 6/7/83 appears to relate to this lawsuit, but American Home failed in its objections to indicate the amount billed. The work performed was, "Receipt and review of answer to second amended complaint: counterclaim of Northbrook against American Home." Since this work is similar to RLH's entry for 5/26/83, the Court will deduct an amount identical to the 5/26 billing, *i.e.* an additional $33.75, from Karon's fees.

m. *September 22, 1983:* Various billing entries appear to deal with this declaratory judgment action, but most items are encased in a multi-part billing entry. The items which concern the Court are the following:

| | | |
|---|---|---|
| LAW 8/10 | Review and analysis of documents in preparation for meeting with counsel for Arnstein & Gluck; meeting with counsel relevant to request for documents and status of various issues and pleadings | $201.25 |
| LAW 8/18 | ... Further consultations regarding discussions with counsel for Dykema and American Home litigation | $57.50 |
| AJM 8/22 | ... Meeting with attorney regarding certain correspondence referencing American Home | $67.50 |
| AJM 8/23 | ... Review of correspondence for letters referring to American Home | $67.50 |
| AJM 8/24 | ... Review of correspondence for letters referring to American Home | $112.50 |
| AJM 8/25 | Review correspondence for letters referring to American Home | $101.25 |
| LAW 8/25 | ... Further discussion relevant to Dykema litigation with American Homes [sic] | (no amount indicated) |
| RLH 8/31 | Telephone conference with G. Kopacz re continuance of hearing and developments in insurance litigation ... Telephone conference with R. Reese re insurance litigation ... | $168.75 |

The 8/10/83 (LAW) and 8/25/83 (AJM) amounts will be deducted in full. The Court believes that a deduction of $287.25 for the remaining items would be sufficient to account for these subentries.

n. *October 15, 1983:* The Court will disallow the following entries (and sub-entries):

| | | |
|---|---|---|
| AJM 9/14 | ... producing correspondence to Rosie Rees | $33.75 |
| AJM 9/21 | ... Review of correspondence for those referring to our relationship with American Home; Meeting with attorney re producing documents | $180.00 |

to Arnstein & Gluck on 9/23/83

LAW 9/21 — Consultation with paralegal relevant to reproduction of documents to counsel for Dykema; telephone conference with firm of Arnstein, Gluck & Lehr relevant to Dykema document; telephone conference with Dykema attorney relevant to privilege issue — $57.50

DRP 9/22 — Consultation regarding correspondence to accompany document production — $18.75

AJM 9/22 — Duplicating and organizing correspondence and memoranda to be produced to Arnstein & Gluck; draft cover letter for documents to be produced — $135.00

AJM 9/23 — Preparation of documents to be reviewed by counsel from Arnstein & Gluck; review documents to be produced to Arnstein & Gluck; meeting with Rosie Rees of Arnstein & Gluck to produce documents re correspondence between Dykema and our firm; draft memorandum regarding meeting with Rosie Rees — $180.00

AJM 9/27 — Review memoranda files for documents refering [sic] to our relationship with American Home — $90.00

AJM 9/28 — Collating memoranda to be produced to Arnstein & Gluck — $22.50

LAW 9/28 — Consultation regarding meeting with counsel for Dykema on insurance litigation; review and analysis of memorandum on discussion relating to production of documents to Dykema's counsel ... — $57.50

The 9/21/83 (LAW), 9/22/83 (DRP), 9/22/83 (AJM), 9/23/83 (AJM), 9/27/83 (AJM) and 9/28/83 (AJM) entries will be deducted in full. The Court believes that a deduction of $140.00 for the remaining items would be sufficient to account for these sub-entries.

o. *December 6, 1983:* The Court will disallow the following entries:

AJM 10/3 — Telephone conference with Rosie Rees of Ainstein [sic] & Gluck regarding copying Dykema privileged documents; telephone conference with copying service regarding copying Dykema's privileged documents — $22.50

AJM 10/4 — Preparation of Dykema's privileged documents to be copied for Arnstein & Gluck — $22.50

AJM 10/10 — Draft letter to Rosie Rees transmitting Dykema's privilege documents and log; duplication and collating Dykema's privilege log for transmittal — $67.50

AJM 10/12 — Organization of copies of documents produced to Arnstein & Gluck on 9/23/83 — $45.00

These amounts will be deducted in full.

In sum, the court will deduct $1,509.75 from the unpaid portion of Karon's billings since it appears to the Court that certain items in the billing statements represent work performed in connection with this lawsuit. All of the remaining fees charged by Karon, however, were part of the expenses incurred in the *Barker* lawsuit. Under the terms of the insurance policy at issue in this lawsuit, American Home must bear the cost of those expenses. The Court is convinced that the amounts charged by Karon's attorneys and paralegals and the hours spent in the *Barker* lawsuit were reasonable in light of the complexity of the litigation and the potential judgment that could have been rendered against Dykema in that case. American Home, therefore, will be ordered to reimburse Dykema for the fees it has already paid to Karon as well as most of the fees yet outstanding.

■ The Court has one final postscript in this matter. The Seventh Circuit recently commented on counsel's duties concerning fee petitions, a related but not identical situation to that presented by this case. The Seventh Circuit noted:

There is a practical limit to what a busy trial judge may be expected to do with the massive fee detail engendered by protracted litigation. As Justice Powell wrote in *Hensley* [v. *Eckerhart*] "[a] request for attorney's fees should not result in a second major litigation." 461 U.S. [424] at 437 [103 S.Ct. 1933 at 1941, 76 L.Ed.2d 40]. Counsel who seek fees have the duty to justify the fees with reasonable, organized, and understandable data so that the trial judge may fairly and expeditiously resolve the fee issue. Counsel who oppose the fees have a sim-

ilar responsibility to state objections with particularity and clarity. Miscellaneous fee data cannot just be dumped on the bench for the judge to sort through and resolve.

*Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.*, 776 F.2d 646, 664 (7th Cir., 1985). Just such a "dumping" occurred here. American Home's objections to Karon's fees were, for the most part, patently specious since almost all of the objected-to time entries clearly pertained to Karon's work on the *Barker* litigation. Where there were doubtful entries, American Home gave the Court no guidance on whether the work pertained to the *Barker* suit or this case. It appeared to the Court that, with a few exceptions, American Home went through Karon's billing statements and indiscriminately highlighted portions thereof in whatever color highlighter was handy. Such a cavalier approach to the issue of damages in this case is, to say the least, inappropriate.

### 3. *Prejudgment interest.*

Finally, counterplaintiffs and American Home disagree on the issue of whether Illinois law or Michigan law controls whether and how much prejudgment interest must be assessed against American Home. The Court believes Michigan law controls this issue.

In *SCA Services, Inc. v. Lucky Stores*, 599 F.2d 178 (7th Cir.1979), the Seventh Circuit held that since the contract at issue in that case provided that all questions of liability between the parties would be de-

termined according to Michigan law, and since interest is part of the measure of recovery for breach of contract, the prevailing party in the suit was entitled to prejudgment interest in accordance with Michigan law. *Id.* at 180.[5]

In support of its position on prejudgment interest, the Seventh Circuit cited the Restatement (Second) of Conflict of Laws § 207 and Comment e (1971). Comment e provides as follows:

> The local law of the state selected by application of the rules of this Section determines whether plaintiff can recover interest, and, if so, the rate, upon damages awarded him for the period between the breach of contract and the rendition of judgment. . . .

The Court has already determined that Michigan law controls the issue of whether American Home was liable for resolution of the claims brought in the *Barker* lawsuit against Dykema. Michigan law, therefore, also controls the issue of the availability of prejudgment interest. *See, e.g., Bott v. American Hydrocarbon Corp.*, 458 F.2d 229, 231 (5th Cir.1972). *But see In re Medico Assoc. Inc.*, 23 B.R. 307, 313–315 (D.Mass.1982) (Massachusetts law provides that prejudgment interest is not part of damage recovery for breach of contract, and so law of forum controls).[6]

Dykema and Northbrook have requested and are entitled to 12 percent interest from the date of the filing of their respective counterclaims to the date of this judgment.[7]

---

**5.** The Seventh Circuit in *SCA Services* did not differentiate, as American Home would have this Court do, between cases where a contract specifically provides for application of a forum's law and cases where the choice of law issue is resolved by application of conflict rules. The Court finds this distinction to be irrelevant to the choice of law issue presented here. *See Morris v. Watsco, Inc.*, 385 Mass. 672, 433 N.E.2d 886, 890 (1982) (". . . [E]ven where the parties have not agreed on the law which governs their rights, the better rule may be in all instances to turn to the law governing rights and duties under the contract to determine the interest payable for breach of contract.")

**6.** American Home argues that *Schoenfeld v. Neher*, 453 F.2d 896 (10th Cir.1972) and *Coleman v. Quaker State Coca-Cola Bottling Co.*, 331 F.Supp. 785 (E.D.Pa.1971) stand for the proposition that the law of the forum state controls the interest issue. Both of these cases, however, concern the availability of post-judgment, not prejudgment, interest and are thus inapposite to the Court's present inquiry.

**7.** Section 600.6013 of the Michigan Compiled Laws provides:

> Interest shall be allowed on a money judgment recovered in a civil action, as provided in this section.

For the reasons set forth in this Memorandum Opinion and in the Memorandum Opinion and Order of this Court dated August 20, 1985, therefore, it is hereby ordered and adjudged that:

1. As to the complaint of American Home and the counterclaims of Dykema and Northbrook, judgment is hereby entered in favor of Dykema and Northbrook and against American Home, as set forth in this Court's Memorandum Opinion and Order of August 20, 1985.

2. The professional liability insurance policy issued by American Home to Dykema obligated American Home to pay the full amount required to terminate the involvement of Dykema in an action in this Court originally captioned *Barker, et al. v. Farrell, et al.*, No. 79 C 2047 ("the *Barker* lawsuit"), and to pay all costs, attorneys' fees and other expenses incurred by or on behalf of Dykema in connection with the defense of Dykema in the *Barker* lawsuit.

3. Neither Dykema nor Northbrook has any responsibility for any of the costs, fees and other expenses incurred by or on behalf of Dykema in connection with the *Barker* lawsuit and the termination of Dykema's involvement in the *Barker* lawsuit.

\* \* \* \* \* \*

For complaints filed on or after June 1, 1980, interest shall be calculated from the date of filing the complaint to the date of satisfaction of the judgment at the rate of 12% per year compounded annually unless the judgment is rendered on a written instrument having a higher rate of interest.
Prejudgment (in fact, precomplaint) interest at a rate of 12% would be allowable also under § 500.2006 of the Michigan Compiled Laws, which provides in relevant part as follows: A person must pay on a timely basis to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance ... the benefits provided under the terms of its policy, or, in the alternative, the person must pay to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance, or a third party *tort claimant 12% interest, as provided* in subsection (4), on claims not paid on a timely basis.

\* \* \* \* \* \*

4. Dykema and Northbrook are entitled to reimbursement from American Home for all costs, fees and expenses, including the $306,250 loaned by Northbrook to Dykema to contribute to the settlement fund in the *Barker* lawsuit pursuant to a loan receipt arrangement, incurred by or on behalf of Dykema in connection with the *Barker* lawsuit and the termination of Dykema's involvement in the *Barker* lawsuit.

5. Within 30 days of the date of entry of this judgment:

(a) American Home shall pay to Northbrook the sum of $306,250.00, plus $100,191.28, representing interest at the rate of 12% per year compounded annually from June 7, 1983 to November 27, 1985.\*

(b) American Home shall pay to Dykema the sum of $20,850.35, plus $7,527.48, representing interest at the rate of 12% per year compounded annually from March 18, 1983 to November 27, 1985, as reimbursement of Dykema's payment of fees to the firm of Arnstein, Gluck, Lehr, Barron & Milligan for representation of Dykema in the *Barker* lawsuit.\*\*

(c) American Home shall also pay to Dykema the sum of $52,193.83 plus $18,843.23, representing interest at the rate of 12% per year compounded annually from

When benefits are not paid on a timely basis the benefits paid shall bear simple interest from a date 60 days after satisfactory proof of loss was received by the insurer at the rate of 12% per annum, if the claimant is the insurer or an individual entity directly entitled to benefits under the insured's contract of insurance.
Dykema and Northbrook have sought interest under § 600.6013, *i.e.*, from the date of their counterclaims, rather than attempting to assess the amount that would be due pursuant to § 500.2006.

\* Interest was compounded on June 7, 1984 and June 7, 1985. Interest from June 7, 1985 to November 27, 1985, inclusive, was calculated using the generally accepted banking year of 360 days.

\*\* Interest was compounded on March 18, 1984 and March 18, 1985. Interest from March 18, 1985 to November 27, 1985, inclusive, was calculated using the generally accepted banking year of 360 days.

March 18, 1983 to November 27, 1985, as reimbursement for Dykema's payment of fees to the firm of Karon, Morrison & Savikas for representation of Dykema in the *Barker* lawsuit.**

(d) American Home shall also pay to Dykema and the firm of Karon, Morrison & Savikas, jointly, the sum of $51,231.13, plus $18,495.67, representing interest at the rate of 12% per year compounded annually from March 18, 1983 to November 27, 1985, for the unpaid portion of that firm's outstanding bill to Dykema for representation in the *Barker* lawsuit.**

(e) American Home shall pay to Dykema all costs of this suit, as set forth in Dykema's bill of costs.